## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SOLOMON HAWKINS, individually, and )
on behalf of all others similarly situated, )
                                )
    *Plaintiff*,                  )
                                )  **Case No.: 3:25-cv-503**
v.                                )
                                )
AMEREN ILLINOIS COMPANY,     )  CLASS ACTION COMPLAINT
JEFFREY B. BURK, INTERNATIONAL )
BROTHERHOOD OF ELECTRICAL )
WORKERS, ANTHONY COOK, JAKE )
ELLIS, and KYLE STORM,         )
                                )
    *Defendants*.             )

## CLASS ACTION COMPLAINT

Plaintiff Solomon Hawkins, on behalf of himself and all others similarly situated, by and through his attorney, Diana E. Wise, hereby file this complaint of race discrimination, harassment, and retaliation, against Defendants Ameren Illinois Company ("Ameren Illinois" or "Ameren"), Jeffrey B. Burk, International Brotherhood of Electrical Workers, Local 51 ("IBEW" or "IBEW, Local 51"), Anthony "Tony" Cook, Jake Ellis, and Kyle Storm, (collectively "Defendants"), and in support state as follow

### NATURE OF THE ACTION

1. This class action is brought to remedy a pervasive policy and practice of race discrimination and harassment instituted and maintained by Ameren Illinois, Mr. Burk (Director of Labor Relations for Ameren Illinois), Illinois Brotherhood of Electrical Workers, Local 51 ("IBEW"), and Tony Cook (Business Representative for IBEW) (hereinafter collectively referred to as "Defendants") in a continuing violation of federal law on behalf of all prospective, former, current, and future Black non-management applicants for and employees within Ameren Illinois' Apprentice and Skilled Craft workforce.

2.    Black individuals are under-represented within Ameren's Apprentice and Skilled Craft workforce and, hence, IBEW's membership. This disparity results from – both individually and in concert – Ameren and IBEW's systemic, intentional race discrimination and harassment and policies and practices that serve no reasonable business purpose yet have a disparate impact on Black individuals.

3.    Plaintiff, and the class he seeks to represent, alleges that Ameren and Jeffrey Burk employ discriminatory company-wide policies and practices regarding hiring, testing, training, assigning duties and overtime opportunities, reviewing, evaluating, following union contracts, extending probationary terms, implementing discipline, and other opportunities. These discriminatory practices unlawfully prevent the hiring of Black individuals; segregate Ameren's workforce; deny Black employees income and advancement opportunities; and cause the probation extension, discipline, or termination of Black employees because of their race.

4.    Plaintiff, and the class he seeks to represent, alleges that IBEW and Tony Cook employ discriminatory union-wide policies and practices regarding representation of Black applicants for and employees within Ameren, through IBEW's individual actions and working in concert with Ameren. These discriminatory practices unlawfully prevent the hiring of Black individuals, segregate Ameren's workforce, deny Black individuals income and advancement opportunities, and cause the discipline or termination of Black individuals because of their race.

5.    Plaintiff, and the class he seeks to represent, alleges that Ameren, Jeffrey Burk, IBEW, and Tony Cook worked in concert to effectuate company-wide and union-wide policies and practices that created systemic discrimination, segregation, harassment and retaliation of Black individuals within Ameren's Apprentice and Skilled Craft workforce.

6.    Plaintiff has filed this lawsuit to hold Defendants accountable for their unlawful treatment of Black individuals and to achieve meaningful reform. This lawsuit is brought by

Plaintiff on behalf of himself and other Black individuals who applied at, work for, or previously worked for Ameren and have been harmed by Defendant's company-wide pattern or practice of race discrimination and discriminatory policies and practices. This action seeks class-wide injunctive relief and an end to Defendants' discriminatory practices.

## JURISDICTION AND VENUE

7.  Plaintiff's claims arise under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 775 ILCS 5/2-102(A) and (C), Illinois Human Rights Act, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

8.  Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. § 1391(b) and (c). Defendant Ameren's corporate headquarters is located in this District. Defendant IBEW's primary business location is in the State of Illinois and its Charity Fund is a registered corporation within the State of Illinois. Defendants Jeffrey Burk and Tony Cook are residents of the State of Illinois.

9.  Defendants hire, train, employ, and represent individuals, including the putative class, in this District. Defendants conduct human resources tasks and union business related to the putative class in this District. Defendants perform extensive business in this District, including providing extensive training to Plaintiff and the putative class in this District.

## THE PARTIES

10. Plaintiff Solomon Hawkins ("Hawkins") is a Black male citizen and resident of the State of Illinois. Plaintiff first began seeking employment at Ameren in 2016; despite many attempts, he was not hired until 2022. Plaintiff was employed by Ameren as a Gas Apprentice from July 20, 2022 until February 27, 2023, when he was discharged.

11. Defendant Ameren Illinois Company is an Illinois corporation headquartered at 10 Executive Drive, Collinsville, Illinois 62234. Ameren may be served through its registered agent, The Corporation Company, at 600 S 2nd Street, Suite 104, Springfield, Illinois 62704-2550. Ameren is an energy services company supplying electricity to 1.2 million customers in more than 1,200 communities across Illinois. Ameren Illinois is a wholly-owned subsidiary of Ameren Corporation, who reported third quarter 2024 net income of $456 million.

12. Defendant IBEW's primary business location is located at 3171 Greenhead Drive, Springfield, Illinois 62711. While IBEW is not a registered corporation, IBEW Local 51's Charity Fund is an Illinois registered corporation and may be served through its registered agent, Tina Brand, at its primary business location. IBEW is an electrical union chartered on October 1, 1944. Upon information and belief, among IBEW's four (4) Officers, fifteen (15) Executive Board members, ten (10) Business Managers and Representatives, and four (4) Office Staff – all are White except one individual.

13. Defendant Jeffrey Burk is a resident of the State of Illinois. At all relevant times, Mr. Burk served as Ameren's Superintendent of Labor Relations. Mr. Burk is White.

14. Defendant Tony Cook is a resident of the State of Illinois. At all relevant times, Mr. Cook served as a Plaintiff's Business Representative for IBEW. Mr. Cook is White and all seven (7) other Business Representatives at IBEW are White.

15. Defendant Jake Ellis is a resident of the State of Illinois. At all relevant times, Mr. Ellis served as Ameren's Apprentice Coordinator and as Plaintiff's effective supervisor, as well as also being a member of IBEW. Mr. Ellis is White.

16. Defendant Kyle Storm is a resident of the State of Illinois. At all relevant times, Mr. Storm served as Plaintiff's Crew Lead and his IBEW Union Steward. Mr. Storm is White.

**FACTUAL ALLEGATIONS**

4

17. On July 20, 2022, Plaintiff Solomon Hawkins' six (6) years of hard work finally paid off: he was offered a position as a Gas Distribution Apprentice at Ameren Illinois' Champaign, Illinois location.

18. Apprentice and Skilled Craft jobs at Ameren are scarce and highly-desired opportunity for those living in rural Illinois: full-time employment at a well-known company with great pay and even better benefits.

19. For Plaintiff, working at Ameren was a dream he had been working towards since July of 2016. Plaintiff underwent an extensive, multi-year pre-employment process, including passing a physical examination and participating in pre-evaluation programs and testing established by the Ameren. Plaintiff was excited to not only excel at his *position*, but to also create and foster a *career* at Ameren Illinois.

20. Unfortunately, within months of starting at Ameren Illinois' Champaign location, Plaintiff's dream turned into a nightmare.

21. In Champaign, there were eight (8) other Gas Apprentices – they were all White. The chain of command above Plaintiff encompassed Crew Leaders (Jake Ellis, Kyle Storm, Nick Umbarger, and Jordy Frerichs), Assistant Foremen (Jake Ellis, at times), Foremen, and Supervisors (Joe Lee and Tyler Potter) – all of whom were responsible for Mr. Hawkin's daily supervision and direction, his training opportunities, and his evaluations upon which his termination were based – they were all White.[1]

22. Crew Lead/Assistant Foreman and Apprentice Coordinator, Jake Ellis often determined which of four (4) crews each Apprentice was on each day; each crew was directed

---

[1] At the time Plaintiff was hired, upon information and belief, there was only one Black employee in Ameren's Champaign location. At the time of filing, upon information and belief, there remains only one Black employee in Ameren's Champaign location.

and supervised by a Crew Lead. Jake Ellis, with input from the other Crew Leads, wrote the Apprentices' performance evaluations.

23. All of the Apprentices, Crew Leads, Assistance Foreman, and Foremen are in IBEW, Local 51. Only the Supervisors in Champaign were non-union, management employees, but the Supervisors were mostly office-based, only visiting work sites sporadically.

24. Plaintiff had not been working at Ameren long when he began receiving text messages featuring Black skin or people during work hours on his personal cell phone.[2]

25. One of his Crew Leaders, Kyle Storm, sent him a picture of a large Black middle finger.

26. Crew Lead/Assistant Foreman and Apprentice Coordinator, Jake Ellis, sent him a video of a Black woman repeatedly ramming her naked buttocks into the face of a White man laying on the ground, until the Black woman ultimately broke the White man's nose.

27. Jake Ellis sent another video: a White man eating feces out of the naked buttocks of a Black Woman. Plaintiff did not respond to these text messages.

28. Plaintiff was subjected to racially-motivated treatment that his fellow – and all White – Apprentices did not receive.

29. Plaintiff noticed the Crew Leads huddling with other Apprentices while he was at his desk. Plaintiff overheard negative comments about him during these huddles.

30. Plaintiff overheard Crew Lead and Apprentice Coordinator Jake Ellis making "jokes" about him. Plaintiff confronted Jake Ellis, stating Plaintiff was just going to work hard to become a journeyman. Jake Ellis responded: "Did you know they fired four Black people last year?

---

[2] Despite having work-issued devices, Ameren employees at least in the Gas Department in Champaign frequently used personal cell phones to communicate about work-related matters. There was a group chat for apprentices, crew leads, journeymen, and foremen.

Ameren is supposed to be diverse, but they fired four Black people last year."

31. Routinely, Plaintiff's coworkers would reference his genitals and insinuate that because he was Black, he must have large genitals. For instance, they would say, "Solomon, that's a big pipe. You can fill that up easily."

32. Crew Lead/Assistant and Apprentice Coordinator Jake Ellis and a fellow Apprentice, Colton, asked Plaintiff if he was on dating apps and told him that he should join Grinder.

33. Plaintiff would return to his work station each day to find the shop's dirt and mud swept to and under his desk.

34. His stool was repeatedly turned upside down so that the seat would get dirty.

35. Later, Plaintiff's stool was removed from his desk completely, causing him to have to stand for months.

36. Plaintiff's cell phone was stolen from his desk and placed in the bathroom.

37. Plaintiff's gloves, which he wore when dealing with sticky material or liquids, were stolen from his locker.

38. Plaintiff's locker handle had sticky material placed underneath it.

39. Plaintiff's locker was wired shut from the inside.

40. Plaintiff's food, purchased from the vending machine, had pencils stuck in it.

41. Plaintiff reported this treatment to his Gas Supervisors, first Joe Lee and then Tyler Potter. Later Plaintiff reported this treatment to Bob Elliot, Regional Superintendent of Gas Operations, and Colby Swain, Director of Gas Operations.  Plaintiff reported that his stool had been removed from his desk (even though this was obvious to anyone who was present in the shop), his lunch had been stabbed with a pencil, his locker had been wired shut, and sticky material had been placed under his locker handle. The Gas Supervisors diminished Plaintiff's reports, no official action was taken, and the harassment continued.

42. Even in the face of this treatment, at all times, Plaintiff successfully completed all objective tests and requirements for the Gas Apprenticeship program.

43. Plaintiff tried to ignore this treatment. He just wanted to do his job. He worked hard. He consistently volunteered for work, eager to learn his job and do his job well. He asked for feedback while working and, in person, was given positive feedback.

44. Plaintiff's monthly evaluations (Gas Journeyman Apprentice Performance Appraisal Form) were all generally positive with regards to his actual skills.

45. Plaintiff's evaluations were written by Crew Leader/Assistant Foreman and Apprentice Coordinator Jake Ellis, after consulting with and gaining input from the other Crew Leaders (Kyle Storm, Nick Umberger, and Jordy Frerichs). Plaintiff's evaluations were presented to him by Gas Department Supervisors Joe Lee and Tyler Potter, with Jake Ellis, and although not as often, Kyle Storm present.

46. Plaintiff's August 22, 2022, September 12, 2022, October 5, 2022, November 22, 2022 and December 27, 2022 all stated that he was a 5 or 6 out of 10 (1/Substandard to 5/Acceptable to 10/Excels). Thus, he was "Acceptable" or above with regard to Job Knowledge, Comprehensive Instructions, Comprehends Gas Standards and Prints, Safety, Initiative, Judgment, Cooperation, Customer Premise Work, Construction Work, Use of Tools/Instruments, Use of Excavating Equipment, and Interest and Attitude.

47. However, beginning on October 5, 2022, Plaintiff received a "NO" response to a summary question at the end of his evaluation: "Has Apprentice shown overall satisfactory progress?"

48. In light of this and other "negative" comments on his evaluation, Plaintiff asked Jake Ellis at the evaluation to explain his alleged poor performance. Jake Ellis' response was that he interviewed all the Crew Leaders and recorded their input. Thus, Plaintiff went to each of the

other Crew Leaders – and the response was the same: "That wasn't on my crew."

49. These answers mirrored Plaintiff's experience when seeking direction, explanation, and training in the field or at the shop. Plaintiff wanted to keep and excel at his job. He took initiative and frequently asked his Crew Leaders how he was performing, how he could improve, and what he could learn. He wanted to rectify the negative comments on his evaluations. The responses from his Crew Leads were always vague and similar: "You're doing fine."

50. Plaintiff asked for additional training if there were any areas he was deficient in. He asked for more direction, explanation, and training while in the field, similar to what the other (White) Apprentices were provided. He did not receive such – or worse, when he did not complete a task perfectly on his first try, his work was deemed a "failure" and documented as evidence that he could not perform his job.

51. For instance, the first time he was directed to arrange a pipe by Crew Leader Kyle Storm, Plaintiff stated he had not done such previously and requested Kyle Storm show him how to perform that task. Kyle Storm became angry and repeated that Plaintiff should go arrange the pipe. Plaintiff again requested Kyle Storm show him how to perform the task, but Kyle Storm told Plaintiff to go figure it out on his own. Another Apprentice, Cody King, stepped in to help Plaintiff arrange the pipe correctly.

52. For Plaintiff's November 22, 2022 evaluation, he again received a "NO" response to the question: "Has Apprentice shown overall satisfactory progress?"

53. Again, despite specific requests for an explanation, Jake Ellis could not provided Plaintiff concrete examples of his alleged poor performance. Frustrated, Plaintiff refuse to sign his evaluation.

54. Plaintiff's refusal to sign his evaluation prompted Crew Leader/Assistant Foreman and Apprentice Coordinator Jake Ellis to provide Plaintiff – and only Plaintiff – a notebook to

track his activities each day and have his assigned Crew Leader for the day sign off on such each day.

55. Plaintiff welcomed the opportunity to prove he was performing satisfactorily. His daily tracking was overwhelmingly positive. For instance, one of the only "negative" comments from Crew Leader Jordy Frerichs was to have direct eye contact when Plaintiff was being coached.

56. Plaintiff was the only apprentice who was prevented from performing on-call overtime. Plaintiff asked consistently about being able to be on call and work overtime, as working overtime is seen as a positive trait by Ameren and the Union. However, Plaintiff was met with different excuses over time.

57. First, the Supervisors told Plaintiff they needed to talk to someone about getting him on the on-call list. However, after several weeks of Plaintiff inquiring about this every other day, Plaintiff was told if he wanted to be on the on-call list, he needed to tell Marie[3] in the front office. Plaintiff went to Marie's office almost every day for six to eight weeks, before he was able to catch her in person. Marie told Plaintiff she would put him on the list, but Gas Supervisor Tyler Potter told Marie that Plaintiff could not be added to the list because he did not have his CDL Class A license – this was the first time Plaintiff heard of this "requirement." Then, after Plaintiff gained his Class A CDL license in winter of 2022, Plaintiff was still unable to accept on-call overtime opportunities, as Tyler Potter did not provide Plaintiff the PIN number needed to accept the jobs. Plaintiff did receive an overtime call, and since he did not have the PIN needed to accept the call, he drove to the location, instead. When he arrived, Plaintiff was told that he did not accept the call with his PIN, but Colton, a white apprentice, did accepted the call with his PIN.

---

[3] Plaintiff believes the employee who was responsible for maintaining the on-call list for overtime was named Marie.

Colton arrived after Plaintiff, but Crew Lead Nick Umbergar stated for Colton to stay and for Plaintiff to be sent home. When Plaintiff told Tyler Potter he needed the PIN number, Tyler Potter told him that they would have to get that to him. Plaintiff did not receive any additional overtime calls thereafter.

58. Plaintiff was treated differently than the other White apprentices. Plaintiff had his classroom training on electrofusion in October of 2022; however, Gas Supervisor Tyler Potter did not test Plaintiff for competency in this skill in the field until months later, December 21, 2022. This is in a stark contrast to other apprentices, who were White, who were observed and certified in the field within days of their classroom training on electrofusion.

**ELECTROFUSION OBSERVATION REPORT**

Ameren
ILLINOIS

Name of Employee Making Electrofusion: Solomon Hawkins

Employee Number: C177118

|  | ELECTROFUSION #1 | ELECTROFUSION #2 | ELECTROFUSION #3 |
|---|---|---|---|
| Date Electrofusion Made: | 12/21/22 | 12/21/22 | 12/21/22 |
| Type of Electrofusion Made (Tee, Coupling, Cap): | Tee | Coupling | Coupling |
| Name of Supervisor / QA / Qualified Management Observed By: | Tyler Potter | Tyler Potter | Tyler Potter |
| Electrofusion Acceptable ? ( Yes / No) | Yes | Yes | Yes |

Any unacceptable Electrofusion observed require immediate reporting to Bill Wofford (Office 217-622-5970)

Upon Completion please send to Denise Specht Mail Code PWN-427 (Pawnee Gas Training Center) Or Email to dspecht@ameren.com Please keep a copy of this form at your local office

59. Plaintiff's December 27, 2022 evaluation was, again, all "Acceptable" or above (5 or 6s out of 10) with regard his actual skills. However, Plaintiff again received a "NO" response to the question: "Has Apprentice shown overall satisfactory progress?"

60. Plaintiff again refused to sign this evaluation. Plaintiff made a personal commitment to continue to show up to work everyday with a great attitude, work as hard as possible, and have

12

a great next month.

61. And he succeeded. Plaintiff was excited to receive his January 2023 evaluation, since his daily tracking notebook would prove his performance had great.

62. However, Crew Leader/Assistant Foreman and Apprentice Coordinator Jake Ellis did not provide Plaintiff a January 2023 evaluation. The explanation provided to Plaintiff was that he had not worked enough days for a January evaluation; Jake Ellis' note on Plaintiff's January 25, 2023 evaluation stated, "Due to injury, not enough time to conduct a proper eval."

63. While it is true Plaintiff suffered a work-related foot injury on December 29, 2022, he only performed light duty (seated work) from January 3, 2023 (Tuesday) to January 6, 2023 (Friday), returning to unrestricted, full duty work after a January 9, 2023 doctor's visit.

64. Plaintiff continued to fill out his daily tracking, but there were times Plaintiff's Crew Leaders would state they were too busy sign such.

65. As Plaintiff began his employment on July 20, 2022, his six (6) month probationary period should have ended on January 20, 2022.

66. Plaintiff's Crew Leaders also began filling out an Apprentice Weekly Form for Plaintiff – and only Plaintiff. For the week of January 31, 2023, Crew Leader/Assistant Foreman and Apprentice Coordinator Jake Ellis wrote:



**APPRENTICE WEEKLY**

Name: S. Hawkings     Division: _____     OC: Clampas

Week of: 1-31-23

Monday: [X] *Does not Meet Expectations     [ ] Meets Expectations     [ ] *Above Expectations
        Overhead                                Underground

Key Points: Works very inefficiently. Seems to know the steps,
takes 30+ min to perform a 5min task.

Crew Leader or Lineman Comments: Needs to pick up the pace.

_____

_____ Crew Leader: _____

67. On January 31, 2023, Plaintiff was using a boring machine with a very expensive electronic piece. He was being careful not to break the electronic piece and admits he spent ten (10) minutes attempting to carefully remove the electronic piece. Jake Ellis watched Plaintiff struggle for 10 minutes, and then came over with a mallet, using the mallet to hit the electronic piece free.

68. The next four (4) days, Crew Leader Kyle Storm filled out Plaintiff's <u>Apprentice Weekly</u>, noting Plaintiff "Meet Expectations" three (3) out of the four (4) days:

**Tuesday:** ☒ ☐ Does not Meet Expectations  ☐ Meets Expectations  ☐ *Above Expectations
☐ Overhead  ☐ Underground

Key Points: Need to be better @ looking at Job and what needs to be done. At this point need to be able to Look ahead without being told. Need to be more Efficient with time. Almost an hour to fuse riser to Pipe isn't going to cut it.

Crew Leader or Lineman Comments: Storm Crewleader
Need to be hardest worker on the Crew, wasn't the case today

Crew Leader: Storm

**Wednesday:** ☐ *Does not Meet Expectations  ☒ Meets Expectations  ☐ *Above Expectations
☐ Overhead  ☐ Underground

Key Points: Did what was Asked. Got Tool + Equip out to Stay ahead on Sub picked up Tools when work complete

Crew Leader or Lineman Comments: _____

Crew Leader: Storm

**Thursday:** ☐ *Does not Meet Expectations  ☒ Meets Expectations  ☐ *Above Expectations
☐ Overhead  ☐ Underground

Key Points: Worked well, stayed ahead on Job progression without being told

Crew Leader or Lineman Comments: Got Tools + Equip out before it was needed and cleaned up when done with Tools. Need this Effort + time management Everyday not Just Somedays

Crew Leader: Storm

**Friday:** ☐ *Does not Meet Expectations  ☒ Meets Expectations  ☐ *Above Expectations
☐ Overhead  ☐ Underground

Key Points: Worked Efficiently. Got Tools out before needed. Ask questions when unsure. Keep building and moving forward

Crew Leader or Lineman Comments: _____

Crew Leader: Storm

69. Notably, Kyle Storm's held Plaintiff to a higher standard than the other Apprentices: "Needs to be the hardest worker on the crew, wasn't the case today." (emphasis added)

70. In early January of 2023, Plaintiff was called into a meeting with Bob Elliott, Regional

Superintendent, and Jake Ellis, Kyle Storm, and Joe Lee. Bob Elliott stated, "I see you haven't been signing your evaluations. Hat's off. No one in the history of being here has done that." Bob Elliott stated that due to Plaintiff's poor evaluations and his refusal to sign those evaluations, he had already spoken with Tony Cook, IBEW Local 51 Business Representative, and Tony Cook had agreed to continue Plaintiff's probation.

71. Plaintiff was then presented with a letter written by Jeffrey Burk, Ameren Superintendent of Labor Relations, allegedly dated January 4, 2023, but allegedly signed on January 3, 2023 by Tony Cook, Business Representative of IBEW Local 51:



January 4, 2023

Tony Cook
Business Representative
IBEW Local Union 51

Re: Solomon Hawkins (177118) - Probationary Period Extension

Dear Tony,

Solomon Hawkins, Gas Apprentice Step 1 in Champaign, began his employment with Ameren Illinois on July 7, 2022. As a result, he should complete his contractual probationary period on January 7, 2023. However, based on direct observations and feedback provided by coworkers through the Apprentice Evaluation process; the Company has concerns regarding his performance and his ability to meet the requirements to be successful.

Therefore, to allow Mr Hawkins the opportunity to improve his performance and as well as the Company additional time to evaluate his job performance, the Company is requesting his probationary period be extended to July 7, 2023. The purpose of this probationary period extension is to provide Mr. Hawkins the opportunity to improve his performance and demonstrate a sustained ability to meet the requirements to successfully complete the Gas Apprenticeship.

This Agreement is being made on a non-precedent setting basis. If you concur, please sign, and return original for our files. Thank you for your attention to this matter.

Sincerely,

*Jeffrey Burk*

Jeffrey Burk
Superintendent. Labor Relations

*Tony Cook*          *1/3/23*
Tony Cook                    Date
Business Representative
IBEW Local 51

cc:    C. Sawin
       B Elliot
       E Lingenfelter
       Personnel File (E-05)

72. Plaintiff's deficiencies were, again, not his objective testing, all of which he had successfully passed, but rather his "performance and appraisals" – the subjective opinions of Crew Lead and Apprentice Coordinator Jake Ellis, as well as the subjective opinions of Crew Leads Kyle Storm, Nick Umburgar, and Jordy Frerichs.

17

73. Plaintiff was not aware there was an issue with his probationary status prior to this meeting.

74. The Supplementary Agreement to the Labor Agreements between Ameren Illinois and U-05 System Council of the International Brotherhood of Electrical Workers, Effective 12/1/2013, titled Gas Journeyman Apprentice Agreement, describes the Joint Apprentice Committee as follows:

3. Gas Apprentice Oversight Committees
   A. Joint Apprenticeship Committee
      (1) Comprised of Company Management, Union Business Managers – equal in number of Company and in number or Union members.
      (2) Also referred to as the JAC, will have the final decision making power in matters concerning the program.
      (3) Will meet at a minimum of annually
      (4) The JAC shall, in conformity with these Apprenticeship and Training Standards and the currently approved Collective Bargaining Agreement, advise and counsel the employer on rules and requirements governing the policies, administration, supervision, education and training of all gas apprentices.
   B. Apprentice Committees
      (1) Comprised of 2 management and 2 union members, consisting of Company Managers or their designees and Union Business Representatives or their designees, at a minimum. Where possible, the Superintendent of Gas Training or a designated Gas Trainer will serve as one of the Company members of each committee.
      (2) An Apprentice Committee will be formed by union, one committee per local without regard to legacy company contract. For example, One apprentice committee for all Local 702 apprentices, for all legacy company contracts ( CIPS 702 E,W,S, IP 702, etc.)
      (3) The committee will meet quarterly at a minimum.
      (4) The committee will monitor the assignments, progress, and evaluations of apprentices in their Local Union to assure program integrity and will address any deficiencies accordingly.
      (5) The committee will provide feedback to the JAC regarding curriculum, opportunities, results, and concerns.
      (6) The Committee may appoint joint subcommittees or representatives who will manage the program in their respective areas and report to the committee.
   C. Gas Apprentice Advisor
      (1) One Apprentice Advisor in each operating center where an Apprentice is located.
      (2) Appointed from the Operating Center bargaining unit by the local Union Representative
      (3) Apprentice Advisor is responsible for mentoring the apprentice and for monitoring, counseling, and evaluating the work performance of the Apprentice in coordination with the Company.

Page 2 of 6
*IBEW – Ameren Illinois Gas Apprenticeship Document*

75. Bobby Wedell is IBEW Local 51's only Business Manager. At no time before or after this meeting did Bobby Wedell, Tony Cook, Kyle Storm or any other union representative or leader speak to Plaintiff regarding his performance, his appraisals, or this extension.

76. In early February of 2023, Bob Elliot informed Plaintiff by letter that his Gas Apprentice Step 1 was being extended 3 months:



February 2, 2023

Solomon Hawkins (177118)
Gas Apprentice 1st Step
Champaign Operating Center

Re: 1st Step – three (3) month Extension

Dear Mr. Hawkins,

The Joint Apprentice Committee met on January 26, 2023 to discuss your performance and progress in the Ameren Gas Journeyman Apprentice Program. The Committee determined, based on your performance and appraisals, you will not advance to the next step of Gas Apprentice 2nd Step. Rather, to provide you additional time to meet said performance standards, your 1st Step has been extended three (3) months, January 25, 2023, through April 25, 2023, at which time your performance will be re-evaluated. As a result, your overall apprenticeship will reflect these three (3) additional months, totaling thirty (30) months. Failure to meet these performance requirements could result in your removal of the apprentice program. Please take this opportunity of meeting the requirements necessary to advance you to Gas Apprentice 2nd Step.

Sincerely,

Bob Elliot
Superintendent, Gas Operations
AIC - Eastern Region Gas

Cc:
    Colby Sawin
    Rita Zindars
    Jeff Burk
    Erin Lingenfelter
    Personnel E-05
    Tony Cook, IBEW Local 51

77. During that meeting, Plaintiff point-blank asked Crew Lead and Apprentice Coordinator Jake Ellis: "Jake, are you trying to get me fired?" Jake Ellis responded, "Well, if we

can't figure something out.." Bob Elliott then cut-off Jake Ellis and told him not to say stuff like that.

78. Despite paying union dues to IBEW since he began at Ameren, Plaintiff received essentially no representation from IBEW, Local 51. In fact, it is clear that IBEW was actually working against Plaintiff.

79. Plaintiff, Crew Lead/Assistant Foreman and Apprentice Coordinator Jake Ellis, Crew Lead Kyle Storm, Crew Lead Jordy Frerichs, and Crew Lead Nick Umbarger are all members of the IBEW, Local 51 bargaining unit.

80. IBEW, Local 51 has a union steward at Ameren's Champaign location. Union stewards are Ameren employees who have a "dual" role as both employee and union representative for the "rank-and-file" employees at the actual work location. Per IBEW, when IBEW, Local 51 welcomed new stewards in July of 2023, union stewards have the following role: "Not only are union stewards key communicators for the local, but they also help enforce our contracts and make sure their co-workers know their rights."[4]

81. <u>Plaintiff's union steward for IBEW, Local 51 at Ameren was Crew Lead Kyle Storm</u>.

82. Kyle Storm was contractually bound to represent Plaintiff as a union member and to make sure Plaintiff knew his rights.

83. Kyle Storm contributed to Plaintiff's evaluations and was often present when Plaintiff received his allegedly poor evaluations.

84. Kyle Storm failed to inform Plaintiff of his right to grieve his evaluations, even after Plaintiff actively disputed his evaluation's allegation of poor performance, desperately sought input and information to identify and address his alleged poor performance, and refused to sign

---

[4] https://ibew.org/articles/23ElectricalWorker/EW2307/LocalLines.0723.html

his evaluation.

85. Kyle Storm failed to inform Plaintiff of his right to grieve his evaluations because Kyle Cook was actively participating in the creation of Plaintiff's evaluations.

86.  Tony Cook never spoke to Plaintiff about his "negative" evaluations alleging poor performance. Tony Cook never spoke to Plaintiff about his probation extension.

87. For Plaintiff's <u>Apprentice Weekly</u> form for the week of February 6, 2023, Crew Leader and Apprentice Coordinator Jake Ellis wrote:



**APPRENTICE WEEKLY**

Name: Soloman Hawkins Division: 4    OC: Urbana

Week of: 02-06-23

Monday: ☐ *Does not Meet Expectations / Overhead    ☒ Meets Expectations / Underground    ☐ *Above Expectations

Key Points: Soloman had a good day today. He asked good questions. Still needs to work on picking up the pace. I" gsvc. SS. Mahomet patton Dr.

Crew Leader or Lineman Comments: Ellis.

88. No other dates were filled out for this week.

89. Plaintiff's <u>Apprentice Weekly</u> form for the week of February 13, 2023, Crew Leader Nick Umberger wrote for February 13th and 14th:



**APPRENTICE WEEKLY**

Name: Solomon Hawkins     Division: D4     OC: Champaign

Week of: 2/13 - 2/17

Monday: ☒ *Does not Meet Expectations     ☐ Meets Expectations     ☐ *Above Expectations
         ☐ Overhead                       ☒ Underground

Key Points: _____

Crew Leader or Lineman Comments: — Could not mount house bracket
— Threw chamfer through window
— Kinked pipe     — Over pressurized main on air test b/c was text on pher
Crew Leader: Umberger

Tuesday: ☒ *Does not Meet Expectations     ☐ Meets Expectations     ☐ *Above Expectations
         ☐ Overhead                        ☒ Underground

Key Points: _____

Crew Leader or Lineman Comments: Argumentative - Does not take personal accountab.
Has to be shown daily tasks
Not grasping gas distribution concepts
Crew Leader: Umberger

90. Over and over, Plaintiff was told he was moving too fast and needed to be quicker:

A. December 27, 2022 evaluation: "Very slow to perform any given task."

B. January 31, 2023 weekly review: "Works very inefficiently. … Needs to pick up the pace."

C. February 1, 2023 weekly review: "Need to be more efficient with time."

D. February 3, 2023 weekly review: "Need the effort and time management everyday not just somedays."

E. February 6, 2023 weekly review: "Soloman had a good day today. He asked good questions. Still needs to work on picking up the pace."

91. On February 13, 2023, Plaintiff was working with Crew Leader Nick Umbarger and

Gas Apprentice Colton Eichelberger. Colton had forgotten his chamfer tool and asked Plaintiff to bring it to him. Plaintiff obtained the tool and stated toward Colton, who said, "Just toss it here." Plaintiff tossed the tool to Colton, but it slipped in his gloved hand, striking and breaking a window near the gas meter.

92. One of the Gas Supervisors reported the incident, asking "I had an informational only meeting with Solomon and Kyle Storm this afternoon to secure facts. I had a conversation with Solomon about the hazards of throwing tools and will go over the importance of not doing this with the group in the morning meeting. Any thoughts on this incident or recommendations on how to proceed (discipline or coaching) please advise." Kyle Storm authored the below summary:

Hawkins, S – damage to customer property FF Summary

**Supervisor notice to Labor**



*Subject:* FW: Customer damage at 412 Harpers Ferry Rd. Savoy

*Gentlemen, This morning at approximately 10:20 A.M. we had a 3 man crew consisting of Nick
Umbarger (crew leader), Colton Eichelberger and Solomon Hawkins. The task at hand was a long side
service to be directional bored in and Solomon and Nick were working by the road as Colton was working
up by the house. Colton was making up the connection between the new service and the pull back head
when he realized he did not have a chamfer tool to prepare the pipe for connection. He then yelled out
to Solomon who was working close to the truck next to the street to bring him the tool. Solomon found
the tool and proceeded to walk to Colton for delivery but as he got closer decided to toss the tool to save
time. The tool subsequently slipped out of Solomons hand during the toss and inadvertently broke the
window of the home they were working on. Nick immediately called and reported the incident and made
the office at Signature Homes aware of the incident with the claim form information and my number to
call with questions. I had an informational only meeting with Solomon and Kyle Storm this afternoon to
secure the facts. I had a conversation with Solomon about the hazards of throwing tools and will go over
the importance of not doing this with the group in the morning meeting. Any thoughts on this incident
or recommendations on how to proceed (discipline or coaching) please advise. Thank*

93. For February 15th, 16th, and 17th, Crew Leader Kyle Storm wrote:

![Ameren logo]

**APPRENTICE WEEKLY**

Name: _Solomon Hawkins_  Division: _____  OC: _Champaign_
Week of: _02-13-23_

**Monday:** [ ] *Does not Meet Expectations  [X] Meets Expectations  [ ] *Above Expectations
[ ] Overhead  [ ] Underground

Key Points: _Worked efficiently with time. Accomplished task when given, and_
_Accomplished task without being told. 2 SS services_

Crew Leader or Lineman Comments: _____

_____ Crew Leader: _Storm_

**Tuesday:** [ ] *Does not Meet Expectations  [ ] Meets Expectations  [ ] *Above Expectations
[ ] Overhead  [ ] Underground

Key Points: _____

Crew Leader or Lineman Comments: _____

_____ Crew Leader: _____

2-15-23

**Wednesday:** [ ] *Does not Meet Expectations  [ ] Meets Expectations  [ ] *Above Expectations
[ ] Overhead  [ ] Underground

Key Points: _____

Crew Leader or Lineman Comments: _____

_____ Crew Leader: _____

2-16-23

**Thursday:** [ ] *Does not Meet Expectations  [X] Meets Expectations  [ ] *Above Expectations
[ ] Overhead  [ ] Underground

Key Points: _Changing Large wires. Appears to Understand process with Bypass_
_Able to use hand tools as need_

Crew Leader or Lineman Comments: _____

_____ Crew Leader: _____



Friday: [ ] *Does not Meet Expectations [✓] Meets Expectations [ ] *Above Expectations
[ ] Overhead     Underground

Key Points: *Change large mtrs*
*2nd day in a row, appears to understand process*

Crew Leader or Lineman Comments: _____

Crew Leader: *Storm*

94. Plaintiff's <u>Apprentice Weekly</u> form for the week of February 20, 2023, Crew Leader

Nick Umberger wrote for February 22nd:

### APPRENTICE WEEKLY

Name: *Solomon*     Division: _____     OC: _____

Week of: *2/21*

Monday: [ ] *Does not Meet Expectations [ ] Meets Expectations [ ] *Above Expectations
[ ] Overhead     Underground

Key Points: _____

Crew Leader or Lineman Comments: _____

Crew Leader: _____

Tuesday: [ ] *Does not Meet Expectations [✓] Meets Expectations [ ] *Above Expectations
[ ] Overhead     Underground

Key Points: *SS New Service*

Crew Leader or Lineman Comments: *Loaded truck, set up job, mounted riser*

Crew Leader: *Umberger*

95. Reviewing all of Plaintiff's weekly evaluations, he was listed as "meets expectations"

eight (8) times and "does not meet expectations" four (4) times.

96. On Thursday, February 22, 2023, Plaintiff received his last monthly evaluation. Jake Ellis, Kyle Storm, Joe Lee and Tyler Potter were all present.

97. Again, Plaintiff received all "Acceptable" or one below (5 or 4s out of 10) with regard his actual skills.

98. However, Plaintiff again received a "NO" response to the question: "Has Apprentice shown overall satisfactory progress?" Plaintiff, again, refused to sign his evaluation.

99. During the evaluation meeting, Plaintiff was told that he had a bad attitude and argued. Plaintiff asked Jake Ellis and Kyle Storm to whom he had a bad attitude and argued; the response was: "That wasn't on my crew!"

100.    On February 22, 2023, there was also an HR investigation regarding the February 13, 2023 broken window.

Hawkins, S – damage to customer property FF Summary

Fact Finding Interviews held on February 22, 2023,

U51 Steward :

- Kyle Storm

Employees interviewed

- Nick Umbarger
- Solomon Hawkins
- Colton Eichelberger

Umbarger - Interview

- Crew Leader on jobsite
- Conducted fact finding
- Working across street when damage occurred
- Did not witness the incident
- Contacted Supervisor to report incident

Hawkins - Interview

- Admitted he was the employee who threw the tool, breaking the window.
- Stated Eichelberger had told him to toss the tool to him
- Answered "yes" to being aware throwing tools and material puts his coworkers at risk and is unacceptable.

Eichelberger – Interview

- Stated he was working at the meter set location
- Needed a chamfering tool – forgot to bring to location
- Noticed Hawkins near the truck
- Asked him to bring tool to him
- Denied telling Hawkins to throw the tool to him, thought Hawkins was rushing.

Finding-

- Hawkin's performance on the day of incident did not meet the safety standards set.
- Hawkins acknowledged was aware he was putting his corker at risk when he threw the tool.
- Thankfully the tool only damaged the window rather than strike a coworker.

8. Please explain in detail, how damage occurred to the window on the house at the jobsite.

Colton was working on riser on the other side of the street and had forgotten the chamfer tool. He yelled over for Solomon to bring it to him. Solomon got the tool and hurried that way when he got 15ft away Colton said "Just toss it here" and Solomon threw it overhand to him and it slipped out of his hand and broke the window.

9. Do you understand throwing tool and material put coworkers at risk of injury and is hazardous and unacceptable?



Yes

10. When your coworker asked for the chamfer tool – did he tell you to throw the tool to him?

Yes

101.    On Monday, February 27, 2023, Plaintiff arrived at work and was called into a meeting with Jeffrey Burk, Superintendent of Labor Relations, Bob Elliott, Joe Lee, and Tyler Potter. Tony Cook was also present. Kyle Storm also tried to attend the meeting, but Plaintiff stated he did not want Kyle Storm present.

102.    Jeffrey Burk told Plaintiff that, due to his poor evaluations, he was being terminated, effective immediately. Jeffrey Burk stated, "Hey man, this job isn't for everyone." Plaintiff responded, "No, this job is easy. There is just racism and prejudice." Plaintiff then began to recite his treatment. Jeffrey Burk stated, "Well, we will have to do an investigation."

103.    Plaintiff was provided a written discharge statement that stated, "As you know, there have been several deficiencies regarding your performance since your hire date. For these reasons, your employment record, and the fact that you are still within your probationary period,

your employment with Ameren is being terminated effective immediately."



February 27, 2023

Solomon Hawkins  (177118)
Gas Apprentice  1st Step
Champaign Operating Center

Re:    Termination – Probationary Period

Dear Mr. Hawkins,

Your employment began with Ameren on July 20, 2022. On January 4, 2023, your probationary period was extended fro an additiona 6 months. As you know, there have been several deficiencies regarding your performance since your hire date.  For these reasons, your employment record, and the fact that you are still within your probationary period, your employment with Ameren is being terminated effective immediately.

Sincerely,

Jeffrey Burk
Superintendent Labor Relations

cc:    Colby Sawin
       Rita Zindars
       Bob Elliott
       Personnel File E-05 – Erin Lingenfelter
       Tony Cook – IBEW Local 51

104.    At that time, and to-date, no explanation has ever been provided to Plaintiff as to what "your employment record" meant.

105.    At this point, Tony Cook had only had one (1) conversation with Plaintiff during

the entirety of his employment at Ameren/membership at IBEW – and that was to solicit union dues from the Plaintiff.

106.    Tony Cook did not discuss Plaintiff's position or experience at Ameren, his "negative" evaluations, his refusal to sign his evaluations, he complaints about his treatment at Ameren, his probation extension, the broken window, or his termination from Ameren.

107.    At Plaintiff's termination meeting, Tony Cook stated, "I can't represent you because you're still on probation." When Plaintiff asked Tony Cook what he could do, Tony Cook told Plaintiff there was nothing he could do, but he would get his dues back.

108.    Plaintiff was then escorted out by Gas Supervisor Tyler Potter. Plaintiff was blindsided and upset. Tyler Potter stated, "Let me see if Tony will talk to you." Tyler Potter went back into the Ameren shop and then returned, stating that Tony stated that Tony had already said what he had to say and there wasn't anything else to talk about, so Tony was not going to come see the Plaintiff.

109.    Article VI, Seniority, Section 1, General, of the Collective Bargaining Agreement ("CBA" or "contract") between Ameren and Mr. Hawkin's union states the following: "New employees, or re-employed employees whose seniority has been terminated, shall serve a six (6) continuous months probationary period with the Company and during such period the Company shall have the right to discharge for its own reasons or rehire such employees."

110.    However, the preamble of the CBA also states: "The Company agrees to recognize the Union as the exclusive bargaining agency for all employees within the scope of this Agreement, and the Union agrees to act as the bargaining agency for all such employees," and "The Union and the Company agree to continue their policies prohibiting discrimination or harassment against any employee because of his or her race, color, religion, sex, national origin, marital status, type of military discharge, physical or mental handicap, or age."

111.    Further, Article I, Territory, Section 4, of the CBA states: "This Agreement shall not apply to supervisory, professional, sales, clerical, office employees and plant guards and they shall not be permitted to perform work covered by this agreement except in emergencies when necessary to safeguard life and property."

112.    Article X, General Provisions, Section 2(g), of the CBA states: "Apprentices shall be trained in all phases of the Journeyman's work." Article X, General Provisions, Section 5, of the CBA states: "Gas Department employees shall perform all duties related to the Company's entire gas function which they are qualified to perform. Gas Department employees will be given the opportunity to train and become efficient on equipment and job duties. Should any employee require assistance on the job, it shall be provided." Article X, General Provisions, Section 10, of the CBA states: "Apprentices of all classes must work with and under the supervision of a Crew Leader or a Journeyman."

113.    After the meeting, Jeffrey Burk emailed Scott Jarmon, Colby Sawin, and Rita Zindars, stating:

**From:** Burk, Jeffrey B <JBurk@ameren.com>
**Sent:** Monday, February 27, 2023 11:27 AM
**To:** Jarmon, Scott A <SJarmon@ameren.com>; Sawin, Colby <CSawin@ameren.com>
**Cc:** Burk, Jeffrey B <JBurk@ameren.com>; Zindars, Rita A <RZindars@ameren.com>
**Subject:** Confidential - Solomon Hawkins - termination

Following  Mr. Hawkins termination, he claimed the Champaign gas employees were discriminating towards him because he was black.

- Coworkers treated him differently because he was black
- Evaluations were inaccurate, he does the same as the other apprentices
- He knows the work, that's clear in his test scores
- The workgroup doesn't training him like they do the white apprentices
- He works hard, they just don't like him because he is black
- He is taking the spot one of their buddy's would have gotten
- He has talked with other black apprentices from different OC's and they experience the same treatment
- Corporately Ameren supports diversity but the field doesn't.

We listened to his claims and I told him I would forward concers to HR.


Thank you,
Jeff


Jeffrey Burk
Superintendent Labor Relations
Ameren Illinois
jburk@ameren.com
Cell:  618-304-9638

114.    Scott Jarmon responded that he was adding Laura Miller, Human Resources, to the email and "Passing to Laura:"

**From:** Jarmon, Scott A <SJarmon@ameren.com>
**Sent:** Monday, February 27, 2023 11:45:20 AM
**To:** Burk, Jeffrey B <JBurk@ameren.com>; Sawin, Colby <CSawin@ameren.com>; Miller, Laura <LMiller5@ameren.com>
**Cc:** Zindars, Rita A <RZindars@ameren.com>
**Subject:** RE: Confidential - Solomon Hawkins - termination

Thanks Jeff.

Passing to Laura.

More to come.

Scott

115.    Laura Miller responded:

**From:** Miller, Laura <LMiller5@ameren.com>
**Sent:** Monday, February 27, 2023 11:47 AM
**To:** Jarmon, Scott A <SJarmon@ameren.com>
**Subject:** Re: Confidential - Solomon Hawkins - termination

And he just called me directly.

116.    Scott Jarmon responded:

**Burk, Jeffrey B**

| | |
|---|---|
| **From:** | Jarmon, Scott A |
| **Sent:** | Monday, February 27, 2023 12:13 PM |
| **To:** | Miller, Laura |
| **Subject:** | RE: Confidential - Solomon Hawkins - termination |

I spoke to Colby this morning before it occurred.  He's had a number of performance issues...the latest one was throwing a tool to a co-worker and taking out a customer's window.  Also understand he would not take constructive feedback on his performance.  They have another black co-worker in the group, Corey Smith.  Any history of complaints from him?

117.    Laura Miller then emailed a note of her conversation with Plaintiff:

**Burk, Jeffrey B**

| | |
|---|---|
| **From:** | Miller, Laura |
| **Sent:** | Monday, February 27, 2023 12:00 PM |
| **To:** | Miller, Laura |
| **Subject:** | Solomon Hawkins |

7/20/22 Champaign Solomon Hawkins

Difficult to say anything

Been evaluated versus knowledge

Trail of one culture Caucasian. I'm
AA. They won't train me. Always say bad things to wash me out

Wired locker shut. Weekend guy did this. Screw hole and tied around pole and then could not open it last Tuesday. Forced open

Stool at my desk and they would turn it upside down. Then someone took it and he could not sit down.

Mentioned to Bob Elliot and other supvs. They dismissed.

All of them are friends. I am an outsider.

Don't think he had a chance. Wanted him to fail.

Know construction guys. A pattern in
Champaign. After fired last AA they hired me.

Crew leads work with asst foreman to evaluate apprentice. Others were just fine. On mine it was creative on how negative it was.

Evaluations were different than heading.

Had threating comments. Crew leader told
Him to keep name
Out of his mouth on a job site.

Crew leaders are evaluating performance.

Point of being washed out
Can someone else watch me?

Been told he is at risk
Extended probation like they do with all black employees. No raise. Extended apprenticeship.

217-278-0128

118.    Laura Miller listened to Plaintiff for approximately 5 minutes and told him that she would have to call him back. Plaintiff never heard from Laura Miller again; February 27, 2023 was Laura Miller's first and only conversation with Plaintiff. in's

119.    On March 6, 2023, Plaintiff, after consulting with an attorney, emailed Tony Cook a grievance and information request for Ameren, requesting the grievance be filed by the Union:[5]

---

[5] IBEW Local 51 did not request information or documentation from Ameren until May 8, 2023, see below.



Fwd: Grievance  `External ×`  `Inbox ×`

**Solomon Hawkins** <solomonhawkins645@gmail.com>
to me

Mon, Dec 18, 2023, 9:43 AM

Sent from my iPhone

Begin forwarded message:

**From:** Solomon Hawkins <solomonhawkins645@gmail.com>
**Date:** March 6, 2023 at 2:50:43 PM CST
**To:** tonyc@ibew51.org
**Subject: Grievance**

Tony,

Please file the attached grievance and information request with management within the 15 days of my last evaluation. If the union will not file this grievance, please provide me the email of the Company Representative so that I may file these grievances.

Thank you,

Solomon Hawkins

2 Attachments • Scanned by Gmail

W  **2023.03.04 – Info...**     W  **Grievance.docx**

**Employee/Grievant: <u>Solomon Hawkins</u>     Grievance Number: _____**

**Employee Position & Location: <u>Gas Distribution Apprentice – Champaign, Illinois</u>**

Solomon Hawkins files this grievance under Article II, Grievance Procedure, of the Collective Bargaining Agreement between Ameren Illinois Company and IBEW, Local Union 51 (hereinafter referenced to as "the CBA").

This grievance grieves the racial discrimination and the harassment suffered by Solomon Hawkins.

Additionally, this grievance grieves the following: (1) the lack of training and opportunities suffered by Soloman Hawkins, (2) the poor evaluations received by Solomon Hawkins, (3) the extension of Mr. Hawkin's probationary period, and (4) the discharge of Mr. Hawkins. Mr. Hawkins suffered these actions due to his race, while his White peers were not subjected to these actions.

This grievance also grieves the actions denying Mr. Hawkins his right to fair union representation.

The actions of the Employer violate The Preamble to the CBA, as well as the following: Article I, Territory, Section 4; Article VI, Seniority, Section 1. General; Article X, General Provisions, Item 3, Miscellaneous Provisions, Section 2; Article X, General Provisions, Item 3, Miscellaneous Provisions, Section 5; Article X, General Provisions, Item 3, Systems Agreement, Section 4, Systems Response Strategy, Subpart E, Systems Coordination Foreman, Paragraph 6; Article X, General Provisions, Item 5: Construction Agreement; Article X, General Provisions, Item 5: Construction Agreement, Paragraph Joint Construction Crews; Article X, General Provisions, Item 5: Construction Agreement, Paragraph Apprentices; Article X, General Provisions, Item 6. Substation Agreement Section, Section 4, Apprentices; Article X, General Provisions, Item 6. Substation Agreement Section, Section 6, Work Assignments; Article X, General Provisions, Item 6. Substation Agreement Section, Section 9, Substation General Foreman; Agreement #12 Driver's License (CDL); and any and all other applicable CBA sections, MOUs, Side Letters, Agreements.

**Information request, sought under the NLRA and the Collective Bargaining Agreement between Ameren Illinois Company and IBEW, Local Union 51.**

In the below, the term "documents" means any and all documents, emails, text messages, or any other written medium.

Please provide:

1.  Documents that created, explain, expand upon, set parameters of, or relate to the functioning of the "Apprentice Committee," a term referenced in the CBA.
2.  Documents that created, explain, expand upon, set parameters of, or relate to the functioning of the "Apprentice Training Committee," a term referenced in the CBA.
3.  Documents that created, explain, expand upon, set parameters of, or relate to the functioning of "the Joint Committee," a term referenced in the CBA.
4.  Documents that created, explain, expand upon, set parameters of, or relate to the functioning of "the Oversight Committee," a term referenced in the CBA.
5.  Any "formal apprentice agreements," a term referenced in the CBA.
6.  A copy of the text messages sent by crew leaders, assistant foremen, foremen, and supervisors from 7/20/2022 to the present, whether on work or personal devices.
7.  Any and all documents referencing, regarding, or in any way related to Solomon Hawkins.
8.  The basis for, as well as provide any and all documents related to, supporting, describing, or contributing to the following phrase: "As you know, there have been several deficiencies regarding your performance since your hire date. For these reasons, your employment record, and the fact that you are still within your probationary period, your employment with Ameren is being terminated effective immediately."
9.  Evaluations, and any documents related to evaluations, including, but not limited to, input, drafts, commentary, corrections, and responses, for Solomon Hawkins and the other apprentices of Ameren Illinois Company from 1/1/2013 to the present.
10. For any employee from 1/1/2013, who was placed on any type of probationary period, please provide:
    a. Name
    b. Race
    c. Hire date
    d. Position and location when placed on the probationary period
    e. Date of placement on probationary period
    f. Reason for probationary period
    g. Whether the employee successfully completed the probationary period
    h. Whether, and if so why, the probationary period was extended
    i. The ultimate outcome of the extended probationary period (ie, returned to prior position, discharged, etc).
11. Documents related to the extension of probationary periods, including, but not limited to, input, drafts, commentary, corrections, and responses, for Solomon Hawkins and any other employee of Ameren Illinois Company from 1/1/2013 to the present.

12. Documents related to <u>employee termination during a probationary period</u>, including, but not limited to, input, drafts, commentary, corrections, and responses, for Solomon Hawkins and any other employee of Ameren Illinois Company from 1/1/2013 to the present.

13. Any documents related to "<u>formal apprentice agreements</u>," a term referenced in the CBA.

14. Any documents related to <u>training and the Gas Distribution Department</u> provided by, recommended by, required by, suggested by, commented upon by, or in any other way are related to, the <u>Ameren Illinois Company</u>.

15. Any documents related to <u>training and the Gas Distribution Department</u> provided by, recommended by, required by, suggested by, commented upon by, or in any other way are related to, the "<u>Apprentice Committee</u>."

16. Any documents related to <u>evaluations</u> performed by, recommended by, required by, suggested by, commented upon by, or in any other way are related to, the "<u>Apprentice Committee</u>."

17. Any MOUs, side letters, or other labor agreements related to apprentices, apprenticeships, evaluations, probationary periods, and termination of employees.

18. Any documents, including but not limited to, policies, trainings, and recommendations, related to the Union and Ameren's "policies prohibiting discrimination or harassment against any employee because of his or her race, color, religion … ," a phrase set forth in the CBA.

 

120.   On March 8, 2023, Plaintiff emailed Tony Cook a detailed factual summary of occurrences supporting his grievance, again requesting the information request be provided to Ameren:

Solomon Hawkins was hired on July 20, 2022 by Ameren Illinois Company as a Gas Distribution Apprentice in their Champaign location. As required by the CBA, Mr. Hawkins underwent an extensive, multi-year pre-employment process, including passing a physical examination and participating in a pre-evaluation program established by the Ameren, prior to being accepted into the Apprenticeship Program.

When Mr. Hawkins was hired, there were eight (8) other Apprentices in Ameren's Champaign location. They are all White. During his entire employment, Mr. Hawkins was the only Black Apprentice in Champaign.

Over Mr. Hawkins in Champaign were crew leaders, assistant foremen, foremen, and supervisors – all of whom were responsible for Mr. Hawkin's daily supervision and direction, his training opportunities, and his evaluations. They are all White.

Only Mr. Hawkins, a Black male, had his probationary period extended and then was subsequently discharged.

In person, the only basis Mr. Hawkins was provided for the extension of his probationary period was the receipt of poor evaluations and his refusal to sign several of his evaluations. In person, the only basis Mr. Hawkins was provided for his discharge was his poor evaluations. Mr. Hawkins was provided a written discharge statement that stated, "As you know, there have been several deficiencies regarding your performance since your hire date. For these reasons, your employment record, and the fact that you are still within your probationary period, your employment with Ameren is being terminated effective immediately." There was no explanation to Mr. Hawkins at the time of his discharge as to what "your employment record" meant.

Mr. Hawkins was to receive monthly evaluations during his probationary period. His evaluations were written by Jake Ellis, Assistant Foreman/Apprentice Coordinator, with input from the crew leaders, including Kyle Storm. Both Mr. Ellis and Mr. Storm, as well as all other crew leaders, are members of the same bargaining unit as Mr. Hawkins.

He received his first evaluation at the end of July, after working for approximately one (1) week, and it was positive. This evaluation was presented by Joe Lee and Tyler Potter, both Gas Supervisors. Mr. Lee and Mr. Potter are both non-union supervisors.

Thereafter, Mr. Hawkins received a text message on his personal cell phone from crew leader Kyle Storm. It was a picture of a large black middle finger. Mr. Hawkins did not respond to this text.

Additionally, Mr. Hawkins received several text messages on his personal cell phone from Assistant Foreman/Apprentice Coordinator Jake Ellis. One was a video of a Black woman repeatedly ramming her naked buttocks into the face of a White man laying on the ground until she ultimately broke the White man's nose. The second video was of a White woman eating feces out of the naked buttocks of a Black woman. Mr. Hawkins did not respond to either text message.

Mr. Hawkins was subjected to "pranks" that other White employees were not subjected to. Mr. Hawkins had dirt and mud swept to and under his desk. Mr. Hawkin's stool was repeated turned upside down so that the seat would get dirty; later, Mr. Hawkin's stool was removed from his desk completely, causing him to have to stand for months. Mr. Hawkin's cell phone was also removed from his desk and placed in the bathroom. Mr. Hawkin's gloves, which he wore when dealing with sticky material/liquid, were removed from his locker. Mr. Hawkins locker handle had sticky material placed onto it. Mr. Hawkin's locker was wired shut from the inside. Mr. Hawkin's food, purchased from the vending machine, had a pencil stuck in it.

Mr. Hawkins ignored all of these pranks. He just wanted to do his job. He worked hard. He consistently volunteered for work, eager to learn his job and do his job well. He asked for feedback while working and was given positive feedback.

Despite this, Mr. Hawkins started receiving 5 out of 10 on his monthly evaluations, with negative comments written by Jake Ellis. These evaluations were presented by Joe Lee and Tyler Potter, non-union supervisors, as well as Mr. Ellis, a fellow union member. Mr. Hawkins signed the first few evaluations, but after questioning the negative comments on the evaluations and not receiving concrete examples supporting the negative evaluations, he refused to sign the remaining evaluations.

Still, Mr. Hawkins wanted to keep and excel at his job. Mr. Hawkins took initiative and attempted to "rectify" the negative comments. He, again, worked hard and asked for feedback. He asked for additional training if there were any areas he was deficient in. He asked for more direction/explanation/training while in the field, similar to what the other Apprentices were provided. He was never given additional training. He was told he was doing fine.

On January 3, 2022, Mr. Hawkins injured his foot while digging. He was off work for a few days and then completed light duty work, returning to regular duty on January 9, 2023.

Mr. Hawkins was not provided his January evaluation; he was informed he had not worked enough days, so they would combine his January and February evaluations.

Shortly thereafter, Mr. Hawkins was called to see Bob Elliot, Superintendent of the Region. Mr. Elliott informed Mr. Hawkins that in all of Ameren history, no one had ever refused to sign an evaluation. Mr. Elliott informed Mr. Hawkins his probationary period was being extended. Mr. Elliott stated he had already spoken with Mr. Hawkin's Union Steward and the Union was in agreement.

On or around February 22, 2022, Mr. Hawkins was given his January/February evaluation. These evaluations were presented by Joe Lee and Tyler Potter, non-union supervisors, as well as Mr. Ellis, his fellow union member. It stated, among other negative things, that he had a bad attitude and argued. When Mr. Hawkins questioned to whom he had a bad attitude and argued, the response was: "That wasn't on my crew!"


On February 27, 2022, Mr. Hawkins was discharged. In person, the only basis Mr. Hawkins was provided for his discharge was his poor evaluations, which had been written by Mr. Hawkin's fellow union members. Mr. Hawkin's Union Steward told him the Union could not intervene, "since he was on probation," and that he would get the union dues he paid back.

Of the nine (9) Apprentices in Champaign, only Mr. Hawkins, the only Black employee, had his probationary period extended.

Of the nine (9) Apprentices in Champaign, only Mr. Hawkins, the only Black employee, was terminated.

121.    Plaintiff followed up with Tony Cook, who stated IBEW's attorney was reviewing the grievance:



122.    Tony Cook texted Plaintiff: "We sent grievance over this afternoon I will let you know what the response is." Plaintiff is unaware of whether the grievance was filed verbatim as written or if such was altered by the Union prior to filing.

123.    Tony Cook asked Plaintiff to meet with IBEW's attorneys. In response, Plaintiff requested non-conflicted counsel, as IBEW's attorney's also represent Plaintiff's fellow bargaining unit members who were responsible for training him, providing him training opportunities, and evaluating him – all of which was used as the basis of Plaintiff's extended probation and termination.

124.    Tony Cook ignored Plaintiff's request and again requested Plaintiff meet with IBEW's attorney.

125.    Tony Cook emailed Plaintiff:



126.    On March 15, 2023, Plaintiff emailed Tony Cook and stated the union had acted in an arbitrary and discriminatory manner, as well as in bad faith, breaching their duty of fair representation:

> Tony,
>
> The union has acted in an arbitrary and discriminatory (due to my race) manner, as well as in bad faith, breaching their duty of fair representation.
>
> My fellow bargaining unit members were responsible for training me and providing me training opportunities, as well as evaluating me. My poor evaluations were the basis of my extended probation and my discharge. The union has breached its duty of fair representation, as well as violated the NLRA, by including in my bargaining unit and representing members/employees who effectively extended my probation and effectively discharged me.
>
> Due to my race, I was subjected to harassment by fellow bargaining unit members. The union failed to act to prevent or stop such harassment. Instead, those same

bargaining unit members were responsible for training me and providing me training opportunities, as well as evaluating me – all of which was used as the basis of my extended probation and discharge.

Due to my race, I was not provided training and I was poorly evaluated by fellow bargaining unit members. The union failed to act to prevent or stop such discrimination. Instead, those same bargaining unit members were responsible for training me and providing me training opportunities, as well as evaluating me – all of which was used as the basis of my extended probation and discharge.

I questioned my poor evaluations, even refusing to sign later ones, and received no concrete answers for my poor evaluations. I asked for feedback, training, and training opportunities to attempt to "rectify" these poor evaluations. My probationary period was extended by union agreement without any discussion with my union representatives. After my discharge, my union steward told me the union could not intervene "since I was on probation," and told me that I would get the union dues I had paid back. The union failed to discuss or investigate these matters with me.

The union breached its duty of fair representation by (1) failing to timely investigate and file grievances regarding my harassment; (2) failing to timely investigate and file grievances regarding my discrimination; (3) failing to timely investigate and file grievances regarding my inadequate and unequal training and training opportunities; (4) failing to timely investigate and file grievances regarding my poor evaluations; (5) failing to timely investigate, agreeing to and failing to timely file grievances regarding my extended probation; (6) failing to timely investigate and initially refusing to file a grievance regarding my discharge.

Up to this point, I have not received non-arbitrary, non-discriminatory, good faith, and fair representation from my union. The union failed to investigate or file a grievance on my behalf until I wrote a grievance, factual basis and information request - and demanded such be filed with my employer (Ameren).

When asked to meet with the union's lawyers, who also represent my fellow bargaining unit members who were responsible for training me and providing me training opportunities, as well as evaluating me – all of which was used as the basis of my extended probation and discharge, I requested representation by non-conflicted counsel. My request has not been addressed; instead, the request to meet with the above attorneys has been reiterated.

I want fair representation and am willing to talk on Friday at 12:00 pm via telephone so the union can investigate these matters. However, I, again, request representation by non-conflicted individuals.

127.    Tony Cook's only response was: "Ok I will call you Friday at 12:"



128.    On March 21, 2023, Tony Cook forwarded Plaintiff Ameren's response to the grievance (Step 1):

## Grievance

Hey Solomon here's the company response to grievance, we have asked to put grievance in abeyance, our attorney is currently out of town ,I will keep you updated as I get information,Tony

Sent from my iPhone



March 17, 2023

Tony Cook
Business Representative
IBEW Local 51
3171 Greenhead Drive
Springfield, IL 62711

Re: Solomon Hawkins – Termination - Grievance Response

Dear Tony,

The Company denies the grievance. The Company denies any violation of the labor contract including the provisions referred to in the grievance.

Moreover, under our labor agreement, Section VI, 1., during the probationary period the Company has "the right to discharge for its own reasons."

At the time of his termination, Mr. Hawkins was a probationary employee. The Company was fully within its rights to discharge Mr. Hawkins.

Based on all facts in this case, the grievance is respectfully denied.

Sincerely,

*Jeffrey Burk*

Jeffrey Burk
Superintendent Labor Relations

Cc:

      Personnel file ( E-05)
      Grievance File



129.    Plaintiff again requested Ameren's response to IBEW's information request.

130.    On March 27, 2023, Plaintiff reached out to Tony Cook via email and text message, asking if the union had responded to the information request:





131.    Tony Cook emailed Plaintiff, attaching a letter from Ameren agreeing to a 30 day

extension:



March 31, 2023

Tony Cook
Business Representative
IBEW Local 51
3171 Greenhead Drive
Springfield, IL  62711

Re: Solomon Hawkins - Grievance – Abeyance request

Grievance # 51P-23-03

Dear Tony,

I have considered the Union's request, dated March 23, 2023, to hold the Solomon Hawkins termination grievance in abeyance.

As discussed with Union Leadership, on a non-precedent setting basis, the Company agrees to hold the grievance in abeyance for a period not to exceed 30 days from the date of this letter.

Please notify me if you intend to advance this grievance further.

Sincerely,

*Jeffrey Burk*

Jeffrey Burk
Superintendent Labor Relations

Cc:
     R. Zindars
     Grievance file ( E-05)

132.    On April 5, 2023, Tony Cook emailed Plaintiff, stating: "Hey Solomon talked with attorney today he would like me to set up a time to talk again and ask you a few questions, shouldn't take long , im available on the17th , 19th morning or afternoon and the 21st in the

morning let me know what works for you thanks , Tony."

133.    On April 12, 2023, Tony Cook emailed Plaintiff, stating: "Hey Solomon sent you a email a while ago, about getting together we have some more questions to ask, im gone tomorrow and Friday, so if you can send me some times next week that would be great , thanks Tony."

134.    On April 13, 2023, Laura Miller and Jeffrey Burk interviewed Tyler Potter, who confirmed that he had little involvement in Plaintiff's evaluations and zero involvement in Plaintiff's probation extension or termination:

Fact-Finding Questions

Please explain how you are involved in the apprentice review? Sign-off? How?

Have monthly evals, forms given by training center. Apprentice liaison and supv go over how
they are doing, any issues/problems, and we all sign the form. And then he sends to pawnee.

Please explain your reviews of Solomon Hankins. What happened? Why was his apprenticeship
extended? Why was he terminated?

He was not cutting it for this work. Stuff he should have know or retained, he wasn't. Crew
members saying he wasn't safe as well. Should not be happening for an employee of 6-7
months. Was not involved in extension of probation. Not real involved in termination. Asked for
input not much else.

Did the apprentice advisor refuse to give Hawkins poor/sub-par ratings? Why? Why did you sign
off if they weren't accurate?

How it works as liaison sits down and has conversation with the crew and rate. Make
comments. He fills out the form. See it when its done. Input from crews was accurate from my
perspective.

All the guys in the back room are a team. Know apprentice evals are seen. They want to throw
him a bone and say he's nice, etc, but don't think he's cut out for the work. No one wants to be a
bad guy or have someone lose their job. Maybe should really pay attention to the numbers, not
just the words.

Tell me about the fact finding with him throwing tools. How did that end? Did that lead (whole or
in-part to the termination)?

Was not here the day it went down. I have to hold everyone accountable. I wasn't there. The
guy said never to throw it. Never had problems with this person. Don't think Hawkins meant to
break a window but he did.

Is there any other information pertinent to this matter that I have not asked about, but that you
feel I need to be made aware of?

No.

135.    On April 13, Plaintiff responded to Tony Cook: "I think the easiest thing would
be for you to email me the questions you have. That way I can really think about your questions
and make sure I provide complete answers."

136.    On April 17, 2023, Tony Cook replied: "Ok I will send you them I just got back
from Wyoming."

137.    On April 18, 2023, Laura Miller and Jeffrey Burk interviewed Jake Ellis, who was represented by both Tony Cook and Kyle Storm for IBEW Local 51:

<u>Fact-Finding Questions</u>

Please explain how you are involved in the apprentice review process?

Two or three years. We do a monthly evals. I will meet with anyone who works with him, crew leaders, etc and see if there are any things we need to denote, positive or negative. Anything we need/want to talk about. Write an eval scoring 1-10. And comment section at the end. Role is ap

Please explain your reviews of Solomon Hankins. What happened?

We run a lot of services. He did not retain things we showed him. Like groudhowg day I will stick around to help him. He had no interest to get better. He didn't have the drive to learn. Did not have a mechanical background. Tried to come up with a plan to train. Altered over time. He was argumentative with us. Would push back and he didn't want to learn/

Did you/review team refuse to give Hawkins poor/sub-par ratings? Why?

Thinks there is a flaw in the system. The way I was taught to do this is we start everyone as a five. We give benefit of the doubt. I didn't want to take him back a step, but towards the end we felt like he still wasn't getting it.

Is there any other information pertinent to this matter that I have not asked about, but that you feel I need to be made aware of?

Many conversations between and Solomon. He asked why we wrote the evals. He said it wasn't him. Wanted him to go to the crew leader and said if they weren't consistent he would rewrite them. He did not do that. Did not keep track.

138.    Significantly, Laura Miller failed to investigate any allegations related to race or harassment. She asked not one question even related to Plaintiff's complaints regarding his disparate treatment.

139.    In Laura Miller's <u>Investigatory Summary</u>, she states she also interviewed Jeff Burk, Janel White, and Jacob Ellis – although these summaries were not provided to the Union or Plaintiff.

140. Laura Miller concluded her investigatory interviews on April 18, 2023.

141. Notably, Laura Miller did not interview Corey Smith, the only other Black individual in the Champaign Gas Department.

142. Even more notable, Laura Miller did not interview Plaintiff.

143. In her Investigatory Summary, Laura Miller concludes, in "HR's Opinion:"

HR Services & Employee Relations Compliance

~~Privileged and Confidential~~ _LM_ 11/1/23
~~Attorney-Client Communication~~ _LM_ 11/1/23
~~Prepared at the Direction of Ameren's Corporate Legal Department~~ _LM_ 11/1/23

## Investigation Summary

**Investigator:**
Laura Miller (E116181), Human Resources

**Accused Parties:**
Jacob Ellis (C121475)

**Interviews Conducted:**
Allegation first reported to HR on 2/27/23.
First witness interview conducted on 3/7/23
Last witness interview conducted on 4/18/23.
Accused party fact finding conducted on 4/18/23.

**Allegation Category:**
Corporate Policy – EEO & Anti-Harassment

**Determination:**
Corporate Policy – EEO & Anti-Harassment: Unsubstantiated

**Overview of Complaints:**
Hawkins claims Ellis (as the evaluator for apprentices) falsified the facts regarding his apprentice performance reviews which the company used to justify his termination. Hawkins claims that this was motivated by his race.

**People Interviewed (in no particular order):**
- Solomon Hawkins (C177118)
- Jeff Burk (E43444)
- Tyler Potter (E137964)
- Bob Elliot (E44088)
- Janel White (E37773)
- Jacob Ellis (C121475)

---

**Assessment and Conclusions (HR's Opinion)**
HR cannot substantiate Hawkins' claims. Hawkins' performance was substandard. That is clear as there were multiple accounts of this, and evaluations also supported this claim. This led his six-month probationary period to be extended (in agreement with the union). The hope was this would allow Hawkins to be able to skill-up and eventually succeed in the role. However, Hawkins' performance did not improve, and he was discharged during his (extended) probationary period.

144.    Tony Cook sent the following questions to Plaintiff:



145.    Plaintiff responded:



146.    April 26, 2023, Tony Cook told Plaintiff he had moved the Grievance to Step 2:



147.    On May 8, 2023, Tony Cook sent Ameren information request, although it was altered from what Plaintiff had requested:[6]

---

[6] IBEW sent information requests to Ameren on May 8, 2023, September 14, 2023, and October 18, 2023. Ameren "responded" to these requests on July 21, 2023, October 11, 2023, and November 3, 2023.

**Local Union No. 51**
**International Brotherhood of Electrical Workers**
3171 Greenhead Drive, Springfield, IL 62711
(217) 726-8481  Fax (217) 726-8487  E-Mail: ibew51j@ibew51.org  www.ibew51.org

May 8, 2023

## SENT VIA E-MAIL AND FIRST-CLASS MAIL

Ameren
Jeff Burk
Superintendent Labor Relations
370 S. Main Street
Decatur, IL  62523

**RE: Local 51/AmerenIP- Solomon Hawkins'**
**Grievance**
**Grievance #51P-23-03**

Dear Mr. Burk:

In furtherance of the Union's obligation as collective bargaining representative and in order to evaluate and process the above-referenced grievance, the Union requests that AmerenIP ("Company") provide the following information within three weeks of the date of this letter.

1. A copy of all documents in the Company's possession which reflect upon Solomon Hawkins' work record at the Company, including but not limited to the following:

   a. All counselings, oral and written warnings, or disciplinary action taken by the Company against Hawkins and any notes, memoranda, or other documents reflecting upon said counselings, warning or discipline;

   b. All evaluations of Hawkins' performance at the Company and any notes, memoranda, or other documents reflecting upon said evaluations;

c. All documents reflecting positively or negatively
upon Hawkins' work performance while employed
by the Company other than those already in
response to requests 1(a) or (b) above;

d. A copy of Hawkins' employment history while at
the Company;

e. Any commendations Hawkins has received while at
the Company.

2. A copy of all Company procedures, policies, rules,
regulations, or the like relating to or reflecting upon
the offenses with which the Grievant is charged
including but not limited to performance deficiencies,
at the time that the termination at issue in this
arbitration was imposed.

3. A copy of all Company procedures, policies, rules,
regulations, or the like relating to or reflecting upon
extending an employee's probationary period, at the
time that the Grievant's probationary period was
extended.

4. All documents reflecting upon the Company's
investigations and facts disclosed during said
investigations of the incidents which led to the
Grievant's termination including any statements taken
from witnesses or any statements or notes prepared by
the person involved in the incidents and/or
investigations.

5. All documents reflecting upon the Company's
investigations and facts disclosed during said
investigations of the incidents which led to the
extension of Grievant's probationary period including
any statements taken from witnesses or any statements
or notes prepared by the person involved in the
incidents and/or investigations.

6. For each bargaining unit employee in the Gas
Department who has had his or her probationary

period extended since January 1, 2013, please provide:

    a. Name of employee;

    b. Race;

    c. Hire Date;

    d. Position and location at time probationary
       period was extended;

    e. Date of extension;

    f. Length of time probationary period was
       extended;

    g. Reason(s) for extension;

    h. The ultimate outcome of the extended
       probationary period (i.e., successful
       completion, termination, resignation, further
       extension etc.); and

    i. All documents relating to or reflecting upon
       this extension and the reason(s) for it including
       but not limited to the extension agreement.

7. For each bargaining unit employee in the Gas
Department who has been terminated during his or her
probationary period since January 1, 2013, please
provide:

    a. Name of employee;

    b. Race;

    c. Hire date;

    d. Position and location at time of termination;

    e. Date of termination;

    f. Reason(s) for termination; and

g. All documents relating to or reflecting upon this termination and the reason(s) for it, including a copy of the employee's entire discipline record.

8. If any other bargaining unit employees in the Gas Department have been disciplined during their probationary period since January 1, 2013, in any manner, please provide the employee's race, and forward copies of any documents reflecting said discipline and the reason for it, including a copy of employee's entire discipline record and service date.

9. Records reflecting the race, position, and employment status of every bargaining unit employee in the Gas Department who has served any part of his or her probationary period since January 1, 2013.

10. All documents relating to or reflecting upon the alleged "several deficiencies regarding your performance since your hire date" referenced by Jeffrey Burk in the Grievant's termination letter dated February 27, 2023.

11. A copy of all procedures, policies, rules, regulations or the like prohibiting discrimination or harassment against any employee because of his or her race, in effect at any time since Grievant's hire date.

12. A copy of any notes, memoranda or other documents reflecting upon or relating to the reasons why the Grievant was terminated to the extent such has not already been provided in response to the above-mentioned requests.

13. A copy of any notes, memoranda or other documents reflecting upon or relating to the reasons why the Grievant's probationary period was extended to the extent such has not already been provided in response to the above-mentioned requests.

Thank you in advance for your cooperation in this matter. If you have any questions concerning the information requested herein, please contact me.

148.    IBEW Local 51's information request failed to include the following that Plaintiff

had written and requested:

     F.   "6. A copy of the <u>text messages</u> sent by Crew Leaders, assistant Foremen, Foremen, and supervisors from 7/20/2022 to the present, whether on work or personal devices."

     G.   "7. <u>Any and all documents referencing, regarding, or in any way related to Solomon Hawkins</u>."

     149.    On May 15, 2023, Ameren and IBEW met for Step 2 of Plaintiff's Grievance; in attendance were Jeffrey Burk, Tony Cook, and Plaintiff. Bob Elliott, the woman,

     150.    On May 26, 2023, Tony Cook forwarded Plaintiff Ameren's response to the grievance (Step 2):



May 26, 2023

Tony Cook
Business Representative
IBEW Local 51
3171 Greenhead Drive
Springfield, IL 62711

Re: Solomon Hawkins – Termination - Grievance Response
    Company Grievance #  51P-23-03

Dear Tony,

We have reviewed the grievance and considered discussions from our May 15, 2023; grievance meeting held at the IBEW 601 Union Business Office. Present during the meeting besides us were Bob Elliot (Superintendent Gas Operations), Karlene, Knisley (IBEW 51 Business Representative), and Solomon Hawkins (Grievant).

The Company denies the grievant's claim that his negative performance reviews and appraisals were based on racial discrimination. As you know, the grievant made similar statements at his termination meeting, which were investigated by Ameren's HR Department. The Company found no indication Gas Apprentice Appraisals completed his coworkers were not reflective sub-standard performance.

Additionally, immediately prior to termination, the grievant failed to follow safe work practices when he threw a tool toward a coworker, breaking a customer's window. The grievant's sub-standard performance as a gas apprentice was the sole basis for termination. As you know, the Union and Company agreed to extend his 1st Step apprenticeship on February 2, 2023, acknowledging the grievant needed additional time to meet performance standards.

The Company denies any violation of the labor contract including the provisions referred to in the grievance. Moreover, as previously stated, under our labor agreement, Section VI, 1., during the probationary period the Company has "the right to discharge for its own reasons."

At the time of his termination, Mr. Hawkins was a probationary employee. The Company was fully within its rights to discharge Mr. Hawkins.

Based on all facts in this case, the grievance is respectfully denied.

Sincerely,

*Jeffrey Burk*

Jeffrey Burk
Superintendent Labor Relations

Cc:

        Personnel file ( E-05)
        Grievance File

151.    On May 31, 2023, Plaintiff emailed Tony Cook and asked when Ameren would respond to IBEW's May 8, 2023 information request. Tony Cook responded, "Don't know the attorney has the request in."

## Fwd: Grievance  `External`  `Inbox ×`



**Solomon Hawkins** <solomonhawkins645@gmail.com>
to me ▾

Sent from my iPhone

Begin forwarded message:

> **From:** Tony Cook <tonyc@ibew51.org>
> **Date:** May 31, 2023 at 8:11:05 AM CDT
> **To:** Solomon Hawkins <solomonhawkins645@gmail.com>
> **Subject: Re: Grievance**
>
> Don't know the attorney has the request in
>
> Sent from my iPhone
>
>> On May 31, 2023, at 7:31 AM, Solomon Hawkins <solomonhawkins645@gmail.com> wrote:
>>
>> Sounds good and also ask when they are turning over the requested documents?
>>
>> Sent from my iPhone
>>
>>> On May 30, 2023, at 4:06 PM, Tony Cook <tonyc@ibew51.org> wrote:
>>>
>>> I will keep you posted on what happens next



152.    On June 23, 2023, Plaintiff reached out to Tony Cook for an update; Tony Cook responded on July 11, 2023:



153.    Tony Cook told Plaintiff:



154.    Tony Cook told Plaintiff:



155.    On July 19, 2023, Plaintiff followed up with Tony Cook regarding the requested documents and the settlement negotiations. He did not receive a response.



156.     In response, Ameren provided an offer to settle Plaintiff's grievance, which included an offer to turn Plaintiff's termination into a resignation and included a very small financial offer.

157.     On August 4, 2023, Plaintiff called Tony Cook, again requesting a copy of Ameren's response to the information request. Tony Cook told Plaintiff the IBEW lawyer had the documents and Tony Cook would let the attorney know Plaintiff would like a copy of such.

158.     On August 7, 2023, a Step 3 meeting for Plaintiff's grievance was held with

Jeffrey Burk, Tony Cook, and Plaintiff present:



159.   On August 7, 2023, after the meeting, Plaintiff followed up with Tony Cook in writing:



160.    On August 8, 2023, Tony Cook emailed Plaintiff:



161.    On August 8, 2023, Jeffrey Burk emailed Tony Cook with Ameren's response to

IBEW's May 8, 2023 information request:

Fwd: Hawkins grievance    `External`   `Inbox ×`

 **Solomon Hawkins** <solomonhawkins645@gmail.com>
to me ▾

Sent from my iPhone

Begin forwarded message:

> **From:** Tony Cook <tonyc@ibew51.org>
> **Date:** August 8, 2023 at 12:30:37 PM CDT
> **To:** Solomon Hawkins <solomonhawkins645@gmail.com>
> **Subject: Fwd:** Hawkins grievance
>
>
>
> Sent from my iPhone
> Here's the information the company sent
> Begin forwarded message:
>
> > **From:** Tina Brand <tinab@ibew51.org>
> > **Date:** August 8, 2023 at 12:29:42 PM CDT
> > **To:** Tony Cook <tonyc@ibew51.org>
> > **Subject:** Hawkins grievance
> >
> >
> > https://cloud.ibew51.org/s/2nHS3XsRXidKXiH



**ILLINOIS**

July 21, 2023

Tony Cook
Business Representative
IBEW Local 51
3171 Greenhead Drive
Springfield, IL 62711

Re: Solomon Hawkins – Grievance – information request

Dear Tony,

I am in receipt of your information request sent via e-mail on 05/08/23. I believe the information below is responsive to your request for information. Each document is attached to the email with this letter.

- #1 – Mr Hawkins records - refer to documents marked as #1
- #2 - Policies – refer to documents marked as #2
- #3 – No policy exists – opportunities for extension are offered case by case
- #4 – Final performance investigation – See attached summary marked #4
- #5 – See attachments related to #1 and #4
- #6 – See attached agreements marked #6 – Note: Labor Relations does not have access to employee race; during the application process, employees have the opportunity self-identify.
- #7- See attached termination letters - Note: Labor Relations does not have access to employee race; during the application process, employees have the opportunity self-identify.
- #8 – See attached agreements marked #8 – Note: Labor Relations does not have access to employee race; during the application process, employees have the opportunity self-identify.
- #9 – Employee list hire 2013 to date. Note: Labor Relations does not have access to employee race; during the application process, employees have the opportunity self-identify.
- #10 – See #1 and #4
- #11 – Attached EEO Policy marked #11
- No information to provide
- No information to provide

Sincerely,

*Jeffrey Burk*

Jeffrey Burk
Superintendent Labor Relations

cc:     Grievance fille E-05

162.    The PDFs provided to Plaintiff are 1, 2, 4, 9, and 11 – if there are PDFs numbered 3, 5, 7, 8, and 10, they were not provided to Plaintiff.

163.    On or around August 30, 2023, Tony Cook requested a call with the Plaintiff to discuss settlement; at this time, Ameren had not provided IBEW their requested information:



164.    On September 14, 2023, after discussing with Plaintiff, the Tony Cook extended a counter-offer to settle grievance. In addition to Ameren's offer to turn Plaintiff's termination into a resignation, this counter-offer included a letter of recommendation, for Ameren to establish

a training program on racism, and a larger financial settlement.

165.     On September 14, 2023, Tony Cook sent a second information request to Ameren:



166.     On September 20, 2023, Ameren emailed Tony Cook and declined the counter-offer:

**From:** "Zindars, Rita A" <RZindars@ameren.com>
**Date:** September 20, 2023 at 7:58:41 AM CDT
**To:** Tony Cook <tonyc@ibew51.org>, "Burk, Jeffrey B" <JBurk@ameren.com>
**Subject: RE: Solomon Hawkins**

Tony, per our discussion, the Company is not interested in the counteroffer to settle the Hawkins grievance.  As you know, Hawkins was a probationary period employee who had several deficiencies in his performance and struggled through the first step of the gas apprentice program.

Thanks,

**Rita A. Zindars, SPHR, SHRM-SCP**
Director, Labor Relations
Office:  217-424-8373
Cell:  217-412-7927
Fax:  314-641-2400

Ameren Illinois
370 S. Main St.
Decatur, IL  62523

167.     On September 26, 2023, Tony Cook told Plaintiff the Employer declined the counter-offer:

Fwd: Offer  External   Inbox ×



**Solomon Hawkins** <solomonhawkins645@gmail.com>
to me ▾

Sent from my iPhone

Begin forwarded message:

> **From:** Tony Cook <tonyc@ibew51.org>
> **Date:** September 26, 2023 at 1:22:49 PM CDT
> **To:** Solomon Hawkins <solomonhawkins645@gmail.com>
> **Subject: Offer**

Hey Solomon they denied your offer, and I reached out again about getting HRs report, I will keep you posted on that a soon as I get it, Tony

168. On September 27, 2023, Plaintiff followed up with Tony Cook regarding settlement information and, again, asking about the requested documents. On September 28, 2023, Tony Cook responded that IBEW was still waiting for Ameren's response to their record request.



169.    Again, Plaintiff again texted Tony Cook and requested Ameren's response to IBEW's information request:



170.    On October 11, 2023, Tony Cook emailed Plaintiff with Ameren's response to IBEW's September 14, 2023 information request, stating, "Here's what they sent;" no other documentation was provided by Ameren:





October 11, 2023

Tony Cook
Business Representative
IBEW Local 51
3171 Greenhead Drive
Springfield, IL  62711

Re: Solomon Hawkins – Information request – Complaint Investigation

Tony:

You requested information regarding the investigation into Solomon Hawkins' discrimination complaint.

The HR Department conducted an investigation into an allegation by Mr. Hawkins that Jacob Ellis falsified the facts regarding an apprentice performance review of Hawkins, because of Hawkins' race.  HR received the allegation on February 27 and interviewed witnesses between March 7 and April 18.  After completing the investigation, the investigator concluded that the allegations of discrimination were not substantiated.  Rather, the investigator found that multiple sources confirmed Hawkins' performance was in fact substandard.  It was confirmed that Hawkins has been given a six-month extension of his probationary period in the hope that the additional time would allow him to skill-up, improve his performance and succeed in his position.  Unfortunately, Hawkins' performance did not improve and he was properly discharged at the end of his extended probationary period.

Sincerely,

*Jeffrey Burk*

Jeffrey Burk
Superintendent Labor Relations

Cc:

Personnel file ( E-05)
Grievance File

171.    On October 18, 2023, Tony Cook sent a third information request to Ameren:

**Burk, Jeffrey B**

| | |
|---|---|
| From: | Tony Cook <tonyc@ibew51.org> |
| Sent: | Wednesday, October 18, 2023 4:22 PM |
| To: | Burk, Jeffrey B |
| Subject: | [EXTERNAL] Hawkins grievance |

**PhishAlarm**                                                    [Report Suspicious]
If any aspect of this email seems suspicious, click the Report Suspicious button.

**EXTERNAL SENDER** STOP.THINK.QUESTION.
Verify unexpected requests before opening links or attachments.

In furtherance of the Union's obligation as collective bargaining representative and in order to evaluate and process the above grievance, the Union requests the Ameren IP ("company") provide the following information within one week of the date of this e-mail: All documents related to or reflecting upon the company's investigation (s) of the Grievant's claim that he was discriminated against on the basis of his race including but not limited to statements taken, notes prepared, data collected, report (s) created, and /or the final decision. Thanks Tony

    172.    On November 3, 2023, Ameren responded to IBEW's October 18, 2023 information request:



November 03, 2023

Tony Cook
Business Representative
IBEW Local 51
3171 Greenhead Drive
Springfield, IL  62711


Re:  Solomon Hawkins – Grievance- Information Request #3 - 10/18/2023 – Company Response


Dear Tony,

This is in response to your most recent request for information received via e-mail on October 18, 2023.

In that e-mail you requested, as follows:

> *In furtherance of the Union's obligation as collective bargaining representative and in order to evaluate
> and process the above grievance, the Union requests the Ameren IP ("company") provide the following
> information within one week of the date of this e-mail: All documents related to or reflecting upon the
> company's investigation (s) of the Grievant's claim that he was discriminated against on the basis of his
> race including but not limited to statements taken, notes prepared, data collected, report (s) created,
> and /or the final decision.*

Accordingly, some of the information responsive to your Request #3 was provided in my prior responses to
your information requests of 5/8/2023 and 9/18/2023. So, I am reattaching those responses, too, as the first
two attachments, here.

Finally, please note that in collecting and reviewing the documents responsive to Request #3, it was
discovered that the "Investigation Summary" document (3-#14) was mistakenly and incorrectly labeled
"Privileged and Confidential Attorney Client Communication Prepared at the Direction of Ameren's Corporate
Legal Department. "  It should not have been labeled as such, so, HR corrected that label by marking through
it, with date and initials, and it is being included in this response.   I also want to confirm that production of that
Investigation Summary is not a waiver of any attorney-client privilege.

The attached documents are as follows:


   3-#1- Response to Information Request #1 and Attachments
   3-#2-Response to Information Request #2 and Attachments
   3-#3 Hawkins Termination letter 2-27-2023
   3-#4-Labor intake report to HR Hawkins termination complaint e-mails
   3-#5 HR Intake notes with Hawkins complaint after termination, 2-27-2023
   3-#6-Fact Finding Labor
   3-#7-Probationary Extension Letter #1, 1-4-2023
   3-#8-Probationary Extension Letter #2, 2-2-2023
   3-#9-Apprentice Evaluations



3-#10, 11, 12-HR interviews: Elliot, Ellis, Potter
3-#13 Shannon Williams probationary termination
3-#14-HR Services Investigation Summary

Sincerely,

Jeffrey Burk
Superintendent Labor Relations

Cc:

C. Fine
R. Zindars
Grievance File

173.    On November 7, 2023, Plaintiff's attorney emailed Tony Cook and Jeffrey Burk, including drafts of Plaintiff's DHR/EEOC and NLRB charges. Plaintiff's attorney requested Ameren's response to IBEW's information request and reminded both parties of their duty to preserve evidence:

> I represent Solomon Hawkins in his IDHR, EEOC, and NLRB matters. I am attaching our Charging Documents related to those matters, which we plan to file shortly. If you would like to discuss pre-filing, please let me know.

> While your duty to preserve evidence in these matters has been in effect since at least Mr. Hawkin's initial allegations of discrimination and improper collective bargaining actions, please consider this an official litigation hold letter/notice. This duty to preserve extends to the computer usage and cell phone usage, including text messages, by Ameren's employees/representatives and the Union's employees/members, regardless of whether the computers or cell phones are personal devices, especially in light of the known, usual and routine practice by

those individuals to use their personal devices for work-related matters. This also extends to the preservation of those actual devices, as we anticipate forensic investigation of such will be necessary.

I am attaching the original information request Mr. Hawkins submitted to IBEW Local 51 to be submitted to the Employer, Ameren, in order to investigate and process Mr. Hawkin's grievance. It is my understanding not all of this information was actually requested by IBEW Local 51. As such, Ameren, please consider this a renewed request for the attached information and/or documentation.

174.    In response, on November 7, 2023, Tony Cook provided Plaintiff and his attorney (1) Ameren's July 21, 2023 response to IBEW's May 8, 2023 information request and (2) (for the first time) Ameren's November 3, 2023 response to IBEW's October 18, 2023 information request:



Fwd: Hawkins info request docs   External   Inbox ×

Tony Cook <tonyc@ibew51.org>
to me

Tue, Nov 7, 2023, 3:34 PM

here's what company has sent and have sent to solomon
Sent from my iPhone

Begin forwarded message:

**From:** Tony Cook <tonyc@ibew51.org>
**Date:** October 25, 2023 at 7:46:49 AM CDT
**To:** Solomon Hawkins <solomonhawkins545@gmail.com>
**Subject: Fwd: Hawkins info request docs**

Here's everything we have gotten from the company I believe I have sent you this already, and waiting on current requests

Begin forwarded message:

**From:** "Burk, Jeffrey B" <JBurk@ameren.com>
**Date:** July 21, 2023 at 12:23:51 PM CDT
**To:** Tony Cook <tonyc@ibew51.org>
**Cc:** "Burk, Jeffrey B" <JBurk@ameren.com>
**Subject: Hawkins info request docs**

Tony,
Attached are documents related to the information request.

You will see in our response; Labor Relations does not have access to employee race; each employee identified in the information request is either a current of former member of IBEW Local 51.  IBEW 51 may have identified the race of each during the application process. After reviewing, if you have a question about a specific employee please reach out.

Thank you again for the extension on this request.

Jeff,

This communication and any attachments may be privileged and/or confidential and protected from disclosure, and are otherwise the exclusive property of Ameren Corporation and its affiliates (Ameren) or the intended recipient. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. Note that any views or opinions presented in this message do not necessarily represent those of Ameren. All e-mails are subject to Ameren policies. If you have received this in error, please notify the sender immediately by replying to the message and deleting the material from any computer.

<1- Hawkins. S. 1st step step extension U51- 02.02.2023.pdf>
<1 - Hawkins. S. 1st step extension U51- 02.02.2023.pdf>

<1- Hawkins Solomon probation extension IBEW 51 01.04.23.pdf>

<7 - Dunning, Sean (141505) - Termination.pdf>

<Letter to Union - Hawkins Information Request- 7.21.23.pdf>

7 Attachments  •  Scanned by Gmail ⓘ

| PDF 1 - Hawkins, S co... | PDF 1- Hawkins S appr... | PDF 2- Gas Apprentic... | PDF 2 - AIC OPERATIO... | PDF 4 - Hawkins S pro... | PDF 9 - US1 active Gas... |
| PDF 11 - Ameren EEO... |



175.    On November 7, 2023, Tony Cook also provided Ameren's July 21, 2023 response to IBEW's May 8, 2023 information request, noting that was all Ameren had provided:



176.    On many occasions, Plaintiff texted and emailed Tony Cook and requested outside representation, since Tony Cook also represented Mr. Hawkin's fellow bargaining unit members who acted as his "supervisor," directing his daily work, evaluating his performance, writing his performance evaluations, and thus effectively causing his termination. Neither Tony Cook, IBEW's attorney, nor anyone else at IBEW responded to these requests.

177.    On November 13, 2023, Plaintiff filed IDHR/EEOC charges against both Ameren and IBEW of discrimination based on race/color, sexual harassment, and hostile/offensive work environment, as well as unfair labor charges against both Ameren and IBEW:

<u>Unfair Labor Practice Charges against Ameren:</u> Employer and the UN have in the

same bargaining unit Apprentices and their co-workers/supervisory employees who are responsible for training, supervising day-to-day activities, and drafting the evaluations of those Apprentices. Those actions effectively determine if Apprentices receive poor evaluations, which directly affects whether an Apprentice will complete their probationary period and/or be discharged. Due to this collusion, Solomon Hawkins has not received non-arbitrary, non-discriminatory, good faith, and fair rep from his UN, who represents both Mr. Hawkins and his fellow employees who Ameren has tasked, and UN has agreed to, with training Mr. Hawkins, supervising his day-to-day activities, and drafting his evaluations, which were the basis of his termination. Thus, the Employer has interfered with employees in the exercise of the rights guaranteed in section 7, as well as interfered with the administration of the UN.

<u>Unfair Labor Practice Charges against IBEW:</u> Solomon Hawkins has not received non-arbitrary, non-discriminatory, good faith, and fair representation from his union. It is Mr. Hawkins understanding the union representatives and lawyers representing him also represent his fellow bargaining unit members – those same co-workers/supervisors who were responsible for training Mr. Hawkins, supervising his day-to-day activities, and drafting Mr. Hawkins evaluations – all of which were used as the basis of Mr. Hawkin's alleged extended probation and subsequent discharge. Mr. Hawkins, several times, requested representation by non-conflicted counsel, but that request has never been addressed. The Union failed to timely investigate and file grievances regarding Solomon Hawkins, improperly agreed to extend his probationary period, initially declined to file grievances regarding his discharge. The union has a conflict of interest due to the make-up of the bargaining unit.

178.    On November 28, 2023, IBEW wrote Plaintiff a letter, stating they were withdrawing his grievance. Plaintiff received this in the mail on or around December 18, 2023:



**Local Union No. 51**
**International Brotherhood of Electrical Workers**
3171 Greenhead Drive, Springfield, IL 62711
(217) 726-8481  Fax (217) 726-8487  E-Mail: ibew51@ibew51.org   www.ibew51.org

**VIA E-MAIL, FIRST-CLASS AND CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

November 28, 2023

Mr. Solomon Hawkins
1513 E. Florida Ave, Apt 104
Urbana, IL 61802

Re:    AmerenIP and IBEW Local 51
       Solomon Hawkins' Grievance

Dear Mr. Hawkins:

IBEW Local 51 has investigated your grievance, has heard and considered your position and arguments with respect to the grievance, and has heard the Company's position with respect to the grievance.

After reviewing all of the facts, positions and arguments in connection with the grievance, as well as the collective bargaining agreement, and consultation with Union legal counsel, Local 51 has concluded that there is not sufficient merit to the grievance for us to prevail at arbitration. Therefore, Local 51 is withdrawing the above-referenced grievance immediately. Local 51 will take no further action with respect to this grievance.

Sincerely and Fraternally,

Robert S. Wedell
Business Manager
IBEW Local 51

179.    This was done without discussion with or an explanation of the basis to Mr. Hawkins.

180.    Upon information and belief, IBEW has stayed grievances in the past for White

individuals where there was pending litigation similar to and/or would resolve the underlying basis of the grievance.

181.    IBEW should have stayed Plaintiff's grievance pending the resolution of Plaintiff's DHR, EEOC, and NLRB litigation.

182.    Upon information and belief, Ameren has stayed grievances in the past for White individuals where there was pending litigation similar to and/or would resolve the underlying basis of the grievance.

183.    Ameren should have stayed Plaintiff's grievance pending the resolution of Plaintiff's DHR, EEOC, and NLRB litigation.

184.    On February 22, 2024, Plaintiff's attorney emailed Nathan Plumb, Ameren's in-house counsel, again requesting Ameren fully respond to Plaintiff's March of 2023 information request. Additionally, Plaintiff's attorney requested the following information:

Diana Wise <dwise@wiseconsumerlaw.com>                                    Thu, Feb 22, 2024 at 1:41 PM
To: "Plumb, Nathan J" <NPlumb@ameren.com>

Good afternoon,

Thank you for this email - it was great to touch base with you, as well.

    …

If your client is not interested in this resolution, I am attaching a copy of the information request Mr. Hawkins asked the Union to forward to Ameren in March of 2023. I understand the Union watered down this request and when Ameren responded to such, it was not complete, especially since Ameren felt the Union was already in possession of certain information. I requested this information request be responded to by Ameren on November 7, 2023 (see attached email); but that request did not receive a response. I would appreciate a response to the information request; in addition to what is included in the attached PDF, we would also ask for all (1) damage incident reports/investigations/documentations from 1/1/2013 to the present, (2) all photos taken or notations/reports made of incorrect work/placement/actions by apprentices from 1/1/2013 to the present, and (3) all notations/emails/reports made regarding apprentices poor performance/negatives/short-comings/policy violations from 1/1/2013 to the present.

If you would like to discuss, please let me know. I'm happy to jump back on a call.

Thanks, Diana

**Diana E. Wise**
Managing Attorney
WISE LAW LLC
637 Highway 50 #601
O'Fallon, IL 62269
Ph: 217-556-8036
Email: dwise@wiseconsumerlaw.com

185.    On May 15, 2024, Plaintiff filed additional IDHR/EEOC charges, as well as Unfair Labor Practice Charges against both Ameren and IBEW regarding the withdrawal of

Plaintiff's grievance:

IDHR/EEOC Charge against Ameren and IBEW: At his termination meeting, Mr. Hawkins stated his termination was due to discrimination and other mistreatment and asked his union representative, Tony Cook, what he could do to contest the termination. Mr. Cook stated there was nothing Mr. Hawkins could do since he was still on probation. Mr. Cook also stated Mr. Hawkins would get back the union dues he had paid. On March 6, 2023, Mr. Hawkins, after consulting with an attorney, emailed Mr. Cook a grievance and requested it be filed by the Union, and on March 8, 2023, Mr. Hawkins emailed Mr. Cook a detailed factual summary of occurrences that had occurred to support his grievance. Mr. Cook told Mr. Hawkins the union had filed his grievance (although an accurate copy of such has not been provided to Mr. Hawkins, so the full details of such are unknown). On several occasions, Mr. Hawkins texted and emailed Mr. Cook and requested outside representation, since Mr. Cook also represented Mr. Hawkin's fellow bargaining unit members who acted as his "supervisor," directing his daily work, evaluating his performance, writing his performance evaluations, and thus effectively causing his termination. Mr. Cook did not respond to these statements. The grievance proceeded through the steps, and, prior to September 14, 2023, Ameren extended an offer of settlement to Mr. Cook, which he relayed to Mr. Hawkins. On September 14, 2023, Mr. Cook extended a counteroffer to Ameren on behalf of and requested by Mr. Hawkins. On September 20, 2023, Mr. Cook told Mr. Hawkins that Ameren had declined his counteroffer. On November 7, 2023, Mr. Hawkin's attorney emailed Mr. Cook and Ameren's Labor Relations Director, Jeffrey Burk, a draft copy of Mr. Hawkin's NLRB ULP and IDHR/EEOC Charge, requesting to attempt to resolve the charges prior to filing such. On November 13, 2024, having received no communication from Ameren, Mr. Hawkin's NLRB ULP and IDHR/EEOC Charge were filed. Without an additional communication between either Mr. Cook/Union and Mr. Hawkins/his attorney or Mr. Burk/Ameren and Mr. Hawkins/his attorney, on or around December 18, 2023, Mr. Hawkins received a letter, dated November 28, 2023, from Mr. Cook stating that Mr. Hawkins grievance had been withdrawn. Due to collusion between Ameren and IBEW/Mr. Hawkin's Union, Mr. Hawkins has

not received non-arbitrary, non-discriminatory, good faith, and fair rep from his UN. Thus, the Employer has interfered with employees in the exercise of the rights guaranteed in section 7, as well as interfered with the administration of the UN. Additionally, Mr. Hawkins has been discriminated again and retaliated against for exercising his rights under the NLRA, Illinois laws, and federal laws, as well as for participating in the IDHR/EEOC/NLRB process.

186.    On January 17, 2025, pursuant to the collective bargaining agreement and the NLRA, Plaintiff's attorney again requested information and documents from IBEW and Ameren:

Diana Wise <dwise@wiseconsumerlaw.com>                                    12:40 PM (10 minutes ago)    ☆    ↩    ⋮
to Patrick, Nathan ▾

Good afternoon,

I am attaching a copy of the information request Mr. Hawkins asked the Union to forward to Ameren in March of 2023. I understand the Union watered down this request and when Ameren responded to such, it was not complete, especially since Ameren felt the Union was already in possession of certain information. I requested this information request be responded to by Ameren on November 7, 2023 and on February 22, 2024. Neither requests received a response.

Pursuant to the parties' contract and the NLRA, please provide a full response to Mr. Hawkin's March of 2023 information request, see attached. These responses should include documents to date, January 17, 2025.

Also, please provide all (1) damage incident reports/investigations/documentations from 1/1/2013 to the present, (2) all photos taken or notations/reports made of incorrect work/placement/actions by apprentices from 1/1/2013 to the present, and (3) all notations/emails/reports made regarding apprentices poor performance/negatives/short-comings/policy violations from 1/1/2013 to the present.

If you would like to discuss, please let me know.

Thank you, Diana

**Diana E. Wise**
Managing Attorney
WISE LAW LLC
637 Highway 50 #601
O'Fallon, IL 62269
Ph: 217-556-8036
Email: dwise@wiseconsumerlaw.com

187.    On all of Plaintiff's evaluations, not once did he receive a 1 (Substandard).

188.    Even Plaintiff's last four (4) days of actual written evaluations, February 15th through February 21st: He was marked as "Meets expectations."

189.    To date, the only concrete evidence Ameren has provided to support their allegations that Plaintiff rendered a performance so poor, such that he must be terminated

immediately, is as follows:

A.    An undated, unsigned Word document:



B.    An unsigned Word document with a photograph labeled, "Wednesday February 1ˢᵗ, 2023," depicting a gas meter. Underneath, it states: "S. Hawkins installed the meter set pictured above. Meter set installed incorrectly with outlet to the left. This resulted in Plaintiff also installing the meter in reverse flow. Coached."



Feb 1, 2023 — S. Hawkins installed the meter set pictured above. Meter set installed incorrectly with outlet to left. This resulted in Mr. Hawkins also installing the meter in with reverse flow. Coached

190.    Regarding the undated, unsigned Word document, upon information and belief,

this is not a contemporaneously created document, as this incident is not mentioned in Plaintiff's , seems to have been created at a later date to attempt to "justify" Plaintiff's poor performance.

191.    Plaintiff disputes ever being late to work and, notably, no contemporaneous documentation or evidence seems to exist to support the allegation Plaintiff was ever late to work.

192.    Upon information and belief, similarly situated White employees were not terminated for poor performance for being late several times.

193.    Plaintiff disputes being told to bring all his mobile devices to work on October 31, 2023; in fact, as stated above, Plaintiff was frequently excluded from informal meetings with Crew Leads.

194.    Upon information and belief, similarly situated White employees were not terminated for poor performance for failing to bring a mobile device to a meeting.

195.    Plaintiff admits that he began training on November 1, 2023 in tennis shoes, as was allowed, and he forgot to change into his work boots thereafter; once Plaintiff was reminded to put on his work boots, he did so immediately.

196.    Upon information and belief, similarly situated White employees were not terminated for poor performance for failing to wear steel toed boots.

197.    Upon information and belief, this is not a contemporaneously created document. Per the Apprentice Weekly form for the week of January 31, 2023, see Paragraph 66, Kyle Storm was Plaintiff's Crew Lead for February 1, 2023 and he failed to state Plaintiff had any issues setting up a gas meter on that date.

198.    Plaintiff admits the first time he set up a gas meter was with Kyle Storm. Kyle Storm had previously, see Paragraph 51, become angry with Plaintiff for asking for assistance and not setting up a task on his own. Thus, Plaintiff did set up the meter without actually connecting the pipes, so that Kyle Storm could review his work. After Plaintiff finished his set

up, Kyle Storm approached Plaintiff and coached Plaintiff that he had placed the outlet on the wrong side of the meter. Plaintiff simply corrected his set up and finalized then connections.

199.    Plaintiff's daily notebook remained in his locker on the day he was terminated and escorted out of Ameren. This notebook, which is overwhelmingly positive regarding Plaintiff's daily work performance, was retained by Ameren, but Ameren has not provided this notebook to IBEW or Plaintiff, even in response to informational requests

200.    Of the other eight (8) Gas Apprentices who were employed by Ameren at the same time as Plaintiff, none of those – all White – Gas Apprentices were terminated by Ameren, despite those Apprentices performing similarly to Plaintiff.

201.    Defendants, acting in concert, intentionally and knowingly carried out the following policies and practices that lead to the systemic racial discrimination against and segregation of Ameren's Black employees in the Apprentice and Skilled Craft workforce:

A.    included Plaintiff's effective supervisors, all of whom were White, and one of whom was also Plaintiff's union steward, in Plaintiff's bargaining unit, despite asserting in the parties' contractual bargaining agreement that supervisors were not included in Plaintiff's bargaining unit;

B.    subjected Plaintiff to representation by only White individuals who failed to alert Plaintiff to his contractual rights, including the right to file grievances related to his harassment and treatment due to his race, as well as his poor evaluations and probation extension;

C.    subjected Plaintiff to representation by only White individuals who failed to investigate, respond to, or file grievances related to Plaintiff's harassment and treatment due to his race;

D.    agreed to extend Plaintiff's probationary period without speaking to

96

Plaintiff, investigating the circumstances, alerting Plaintiff of his right to file a grievance regarding, or otherwise providing fair, impartial, and without ill will or discrimination representation of Plaintiff (when, again, Plaintiff's extension of probation was based on the subjective review and evaluation of his White fellow bargaining unit members who acted as his effective supervisor);

E.      upon information and belief, failed to extend the probationary period of any of Plaintiff's fellow, White Gas Apprentices;

F.      relayed to Plaintiff on February 27, 2023 that he was being terminated solely for poor performance and no other reason, despite, on January 4, 2023, extending Plaintiff's probationary period to July 7, 2023 "to provide [Plaintiff] the opportunity to improve his performance and demonstrate a sustained ability to meet the requirements … ;"

G.      asserted to Plaintiff that he had no contractual bargaining rights after his termination, including that neither IBEW or Plaintiff had the ability to file a grievance against Ameren, despite Plaintiff alleging his treatment, harassment, and termination were due to his race and the Defendant's contractual bargaining agreement have a prohibition against discrimination and harassment in a separate and distinctly enforceable clause;

H.      failed to file a grievance regarding Plaintiff's poor evaluations, harassment, probation extension, or termination until Plaintiff wrote the grievance himself, emailed such to Defendant Tony Cook and demanded that such be filed;

I.      insisted to Plaintiff that IBEW and Tony Cook were representing him fairly,

impartially, and without ill will or discrimination under the Defendant's contractual bargaining agreement, including investigating his grievance, despite also representing the White effective supervisors Plaintiff had accused of discrimination and harassment;

J.      refused to provide Plaintiff with union representation who did not also represent those fellow bargaining unit members Plaintiff accused of discrimination and harassment, despite Plaintiff requesting such on several occasions;

K.      asserted to Plaintiff that Tony Cook and IBEW could not seek the cell phone data from Plaintiff's fellow bargaining unit members, despite Plaintiff alleging discriminatory actions by Plaintiff's fellow bargaining unit on those cell phones, which were commonly used at work and for work purposes;

L.      represented to Plaintiff that Defendants' were conducting their contractual grievance procedures as completely opposite parties without any concerted actions or common goals;

M.      asserted to Plaintiff that Defendants' had conducted unbiased investigations into Plaintiff's allegations and/or grievance, which found no evidence to support Plaintiff's claims;

N.      claimed to Plaintiff that Defendant IBEW had "investigated his grievance" and "after reviewing all of the facts, positions and arguments in connection with the grievance" had withdrawn his grievance solely on that basis, despite Plaintiff having filed his charges against the Defendants with the NLRB and IDHR/EEOC a mere fifteen (15) days prior; and

O.      withdrew Plaintiff's grievance, despite agreeing to a usual and ordinary

course of action in labor law of staying a grievance pending the outcome of directed related litigation.

202.    Plaintiff has filed this lawsuit to hold Defendants accountable for their unlawful treatment of Black individuals and to achieve meaningful reform. This lawsuit is brought by Plaintiff on behalf of himself and other Black individuals who applied at, work for, or previously worked for Ameren and have been harmed by Defendant's company-wide pattern or practice of race discrimination and discriminatory policies and practices. This action seeks class-wide injunctive relief and an end to Defendants' discriminatory practices.

## GENERAL PATTERNS OF
## DISCRIMINATION, SEGREGATION AND HARASSMENT

203.    With the possible exception of Ameren's East St. Louis office, Black individuals are under-represented within Ameren's Apprentice and Skilled Craft workforce. In Champaign, where Plaintiff was employed, there were only two Black employees in the Gas Department; after Plaintiff's termination, only one Black employee remained (and he completed his probationary period in another location).

204.    Since 2017, in Champaign, where Plaintiff was employed, only two Gas Apprentices have been terminated: Plaintiff and L.M. – both were Black.

205.    Ameren's rural Apprentice and Skilled Craft work locations, including crew leaders and supervisors, are comprised significantly of White males, many of whom interact with each other socially before, during, and after their employment with Ameren.

206.    Thus, Black individuals, who do not look like the majority of the current workforce and do not have ties socially to most of the current workforce, fail to be hired, tested, trained, assigned duties and overtime opportunities, reviewed, evaluated, treated under union contracts, and disciplined through intentional, systemic policies and practices of race

discrimination.

207.    Ameren practices statewide systemic racial discrimination against and segregation of its black employees, which is not justified by business necessity. Ameren discriminates against Black individuals in their hiring practices, while Black individuals are employed, and within its collective bargaining functions. These decisions to discriminate, segregate, and retaliate are based in most instances on very subjective judgements of predominantly White effective supervisors, supervisors, and management. These policies and practices have both a disparate impact and result in disparate treatment for Black individuals, preventing the hiring of Black individuals; segregating Ameren's workforce; denying Black employees income and advancement opportunities; and causing the probation extension, discipline, or termination of Black employees because of their race. These policies and practices are systemic continuing violations.[7]

208.    IBEW's employees and leadership are almost exclusively White. Upon information and belief, among IBEW's four (4) Officers, fifteen (15) Executive Board members, ten (10) Business Managers and Representatives, and four (4) Office Staff – all are White except one individual.

209.    Black individuals, who do not look like the majority of IBEW's employees and leadership and do not have ties socially to most of IBEW's employees and leadership, fail to be represented fairly by IBEW through intentional, systemic policies and practices of race discrimination.

210.    IBEW's policies and practices, which are not justified by business necessity, have both a disparate impact and result in disparate treatment for Black individuals, preventing the hiring, maintaining, promoting, and collective bargaining fair treatment of Black individuals because

---

[7] Upon information and belief, Defendants, including Ameren and IBEW, made some changes to their policies and practices upon receipt of Plaintiff's EEOC and NLRB charges.

of their race. These decisions to discriminate, segregate, and retaliate are based in most instances on very subjective judgements of predominantly White effective supervisors, supervisors, and management. These policies and practices have both a disparate impact and result in disparate treatment for Black individuals, preventing the hiring of Black individuals; segregating Ameren's workforce; denying Black employees income and advancement opportunities; and causing the probation extension, discipline, or termination of Black employees because of their race. These policies and practices are systemic continuing violations.

211.    Ameren and IBEW, together, administer the parties' collective bargaining agreement through intentional, systemic policies and practices of race discrimination that disparately affect Black individuals, leading to Black individuals having disparate outcomes in terms of hiring, training, assigning duties, reviewing, evaluating, disciplining, considering probations, discharging, alerting of contractual rights, filing and pursuing grievances on behalf of, and representation under the parties' collective bargaining agreement.

212.    Intentional discrimination is reflected in the disproportionate number of White individuals hired for, working at, or formerly worked at Ameren in its Apprentice and Skilled Craft workforce compared to the racial composition of the appropriate feeder pool.

213.    In sum, Defendants have and are engaged in an ongoing pattern or practice of race discrimination and knowingly employs company-wide policies and practices that have a disparate impact on Black individuals. Defendant's systemic discrimination against Black individuals includes, but is not limited to, the following policies and practices:

> A. failing to hire Black individuals and employing discriminatory recruitment and hiring policies and practices;
>
> B. employing discriminatory policies and practices regarding within training and assigning of duties provided to Black individuals;

C.  employing discriminatory policies and practices regarding reviewing and evaluating performance of Black individuals;

D.  employing discriminatory policies and practices regarding overtime and promotional opportunities for Black individuals;

E.  employing discriminatory policies and practices regarding discipline of Black individuals;

F.  employing discriminatory policies and practices regarding probation extensions of Black individuals;

G.  employing discriminatory policies and practices regarding terminating Black individuals;

H.  employing discriminatory policies and practices regarding implementation of the Defendant's collective bargaining agreement, including notice of contractual rights, filing and pursuing grievances on behalf of, and representation within the grievance process of Black individuals;

I.  employing discriminatory policies and practices regarding probation extensions of Black individuals;

J.  employing policies and practices that disproportionately disadvantage Black Individuals;

K.  failing to apply and enforce Ameren and IBEW policies and contractual rights in a consistent, race neutral fashion, to the detriment of Black individuals;

L.  retaliating against Black individuals who complain of discrimination or assert contractual or statutory rights;

M. disciplining, extending probation, and/or terminating Black individuals on account of race and/or due to subjective standards.

214.    The intentional and disparate impact discrimination described above is ongoing and constitutes a continuing violation of the civil rights laws. The racially discriminatory policies and practices at Ameren and IBEW are uniform and state-wide in scope. Putative class members work or worked for Ameren across the State of Illinois and were harmed by these same policies and practices.

## CLASS ALLEGATIONS

215.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of Black Individuals who applied at, work at, or worked for Ameren within its Apprentice and Skilled Craft workforce and who were subjected to discrimination by Defendants due to their race. All requirements of class certification are met by the proposed class.

216.    The class of Black applicants, employees and former employees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

217.    The systemic pattern and practice of intentional discrimination against and segregation of black employee are common questions of fact and law for the class case.   The overwhelmingly white upper management implements the pattern and practice of discrimination and segregation based on highly subjective bases that lend themselves to racial discrimination.

218.    There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

219.    The claims alleged by Plaintiff are typical of the claims of the class members. Fed. R. Civ. P. 23(a)(3).

220.    The claims of Plaintiff are reflective of Defendants' systemic discrimination toward Black individuals within Ameren's Apprentice and Skilled Craft workforce.

221.    Plaintiff is an excellent class representative, having substantial knowledge of

both Ameren and IBEW's policies and practices as they are applied to Black individuals. There are no conflicts between Plaintiff and the Class, and Plaintiff will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The issues of determining liability and equitable relief, among other issues, are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

222.    Plaintiff has retained counsel experienced in complex litigation, including labor law, and class action litigation to protect the interests of the class. Plaintiff's counsel was previously named Class Counsel in litigation with over 13,000 class members. Plaintiff's counsel has agreed to advance the costs of the out-of-pocket expenses of this litigation and have the ability to do so.

223.    The proposed class also meets the requirements for certification under Rule 23(b)(2) and Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

224.    The class is appropriate for certification under subsection (b)(2) in that the Defendants have acted and refused to act on grounds generally applicable to the class making mandatory injunctive and declaratory relief appropriate as to the class as a whole, and such relief should also include but not be limited to the granting of:

    a.    Preferential rights of first refusal to those class members who have suffered discrimination in not being hired to grant them access to employment or a "rightful place" within Ameren's Apprentice and Skilled Craft workforce.

    b.    Preferential rights of first refusal to those class members who

have suffered discrimination in not being granted access to training, testing, and assignment of duties on the same basis as White employees to grant them access to their "rightful place" within Ameren's Apprentice and Skilled Craft workforce.

      c.     Preferential rights of first refusal to those class members who have suffered discrimination in being discriminatorily reviewed and evaluated subjectively to grant them access to their "rightful place" within Ameren's Apprentice and Skilled Craft workforce.

      d.     Preferential rights of first refusal to those class members who have suffered discrimination in not being offered overtime and other promotional opportunities to grant them access to their "rightful place" within Ameren's Apprentice and Skilled Craft workforce.

      e.     Preferential rights of first refusal to those class members who have suffered discrimination in being disciplined, denied timely completion of their probationary period, and/or terminated to grant them access to their "rightful place" within Ameren's Apprentice and Skilled Craft workforce.

      f.     Preferential rights of first refusal to those class members who have suffered discrimination in not being provided notice of and access to their contractual rights and/or fair representation within the implementation of the Defendant's contractual bargaining agreement to grant them access to their "rightful place" within Ameren's Apprentice and Skilled Craft workforce.

      g.     Preferential rights of first refusal to those class members who have suffered discrimination in being retaliated against for complaining

about or asserting their administrative or statutory rights related to
Defendant's discriminatory actions to grant them access to their "rightful
place" within Ameren's Apprentice and Skilled Craft workforce.

      h.    Equitable relief in the form of back pay, front pay, and
benefits to compensate for discrimination and retaliation.

225.    The class has inadequate remedies at law thus making injunctive and declaratory
relief necessary.

226.    The patterns and practices which will be proven by statistical proof are common
to the class as pleaded and clearly predominate over any question affecting only individual class
members. There exists generalized evidence that proves many elements on a class-wide basis.

227.    A class action is superior to other available methods for fair and efficient
adjudication of the controversy. Individual members of the class do not have the resources to
marshal the kind of statistical proof and cumulative anecdotal evidence that can be adduced by
these Plaintiffs in a class action. Individual class members have an incredibly strong interest in
having class representatives prove up the company-wide practices in a way that no individual
class member could.

228.    In light of the nature of the claims of the class there is no likelihood that
difficulties will be encountered in managing the case as a class action. On information and belief,
Defendant has uniform computerized payroll and personnel data that will make calculation of back
pay, front pay and other compensation for specific class members relatively simple. The propriety
and amount of punitive damages are issues common to the class and does not present a
management problem.

229.    Though compensatory and punitive damages are sought for the class, the
equitable relief described above is the dominant relief for the class making certification under

(b)(2) appropriate.

230.   Hybrid certification under sections (b)(2)/(b)(3) is also appropriate.  Such certification has often been deemed appropriate in employment discrimination class actions. Under such certification, Stage I would be tried under (b)(2) and Stage II would be tried under (b)(3).   In Stage I, liability and punitive damages would be tried.  In Stage II, individual relief would be determined including back pay, front pay, compensatory damages, and individual injunctive relief for those class members who alleged entitlement to such relief.

231.   A class action is superior to other available methods for fair and efficient adjudication of the controversy.  Individual members of the class do not have the resources to marshal the kind of statistical proof and cumulative anecdotal evidence that can be adduced by these Plaintiffs in a class action.

### COUNT I
### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981
### (Against all Defendants)

232.   Plaintiff, on behalf of himself and all others similarly situated, realleges paragraphs 1 through 214 and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

233.   Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

234.   Defendants maintained state-wide discriminatory employment and labor representation practices and engaged in a pattern or practice of systemic race discrimination against Black individuals that constitutes illegal intentional race discrimination in violation of 42

U.S.C. § 1981.

235.    Plaintiff and Black individuals who applied to, work at, or worked for Ameren in its Apprentice and Skilled Craft workforce, and were members of IBEW, were harmed and will continue to suffer irreparable injury by Defendant's conduct.

236.    Plaintiffs and the class have suffered substantial economic loss of compensation and benefits as a result of the intentional discrimination by Defendants.

237.    Defendants' conduct has caused pain and suffering and loss of future earning capacity to Plaintiff and to the class.

238.    Defendants' actions were willful, gross and reckless disregard of Plaintiff's and the putative class members' rights under 42 U.S.C. § 1981.

239.    As a direct and proximate result of Defendants' discrimination against them, Plaintiff and the class are entitled to the relief set forth in the Prayer below.

### COUNT II
### RACE DISCRIMINATION, 42 U.S.C. § 2000e, *et seq*.
### (Against Defendants Ameren and IBEW)

240.    Plaintiff, on behalf of himself and all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

241.    Plaintiff has filed charges of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), which placed Defendant on notice of the representative allegations contained in this Complaint.  Plaintiff has exhausted his administrative remedies and received his Notice of Right to Sue from the EEOC and filed their individual and class Title VII claims within 90 days of receipt of such notices.

242.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of

employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

243.    By its conduct as alleged herein, Defendant unlawfully discriminated against Plaintiff and those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

244.    Plaintiff and Black individuals who applied to, work at, or worked for Ameren in its Apprentice and Skilled Craft workforce were harmed and will continue to suffer irreparable injury by Defendants' conduct.

245.    Plaintiffs and the class have suffered substantial economic loss of compensation and benefits as a result of the intentional discrimination by Defendants.

246.    Defendants' conduct has caused pain and suffering and loss of future earning capacity to Plaintiff and to the class.

247.    Defendants' actions were willful, gross and reckless disregard of Plaintiff's and the putative class members' rights under 42 U.S.C. § 2000e, *et seq*.

248.    As a direct and proximate result of Defendants' discrimination against them, Plaintiff and the class are entitled to the relief set forth in the Prayer below.

**COUNT III**
**RETALIATION IN VIOLATION OF 42 U.S.C. § 1981**
**(Against all Defendants)**

249.    Plaintiff, individually, incorporates all allegations above as though fully stated herein.

250.    Plaintiff engaged in protected activity by complaining to management and the union of his unlawful treatment due to his race, as well as asserting his statutory rights, such as filing charges with the National Labor Relations Board ("NLRB") and IDHR/EEOC.

251.    Plaintiff suffered retaliation and materially adverse action because of their protected activity, in violation of 42 U.S.C. § 1981, and was harmed as a result.

## COUNT IV
## RETAILIATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*
### (Against Defendants Ameren and IBEW)

252.    Plaintiff, individually, incorporates all allegations above as though fully stated herein.

253.    Plaintiff engaged in protected activity by complaining to management and the union of his unlawful treatment, as well as asserting his statutory rights, such as filing charges with the NLRB and IDHR/EEOC.

254.    Plaintiff suffered retaliation and materially adverse action because of his protected activity, in violation of 42 U.S.C. § 2000e-3(a), and was harmed as a result.

## COUNT V
## RACE DISCRIMINATION IN VIOLATION OF 775 ILCS 5/2-102(A) and (C)
### (Against Defendants Ameren and IBEW)

255.    Plaintiff, on behalf of himself and all others similarly situated, incorporates all allegations above as though fully stated herein.

256.    Plaintiff has filed charges of race discrimination with the Illinois Department of Human Rights ("IDHR"), which placed Defendant on notice of the representative allegations contained in this Complaint.  Plaintiff has exhausted his administrative remedies and received his Notice of Right to Sue from the IDHR and filed their individual and class claims within 90 days of receipt of such notices.

257.    Section 2-102(A) of the IHRA, 775 ILCS 5, states that it is a civil rights violation for an employer to "refuse to hire, to segregate, to engage in harassment as defined in subsection (E-1) of Section 2-101, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms,

privileges or conditions of employment on the basis of unlawful discrimination, citizenship status, or work authorization status."

258.    Section 2-102(C) of the IHRA states that it is a civil rights violation for a labor organization, among other things, to "limit employment opportunities, selection and training for apprenticeship in any trade or craft, or otherwise to take, or fail to take, any action which affects adversely any person's status as an employee or as an applicant for employment or as an apprentice, or as an applicant for apprenticeships, or wages, tenure, hours of employment or apprenticeship conditions on the basis of unlawful discrimination, citizenship status, or work authorization status."

259.    Section 2-101, subsection (E-1), of the IHRA defines "harassment" as "any unwelcome conduct on the basis of an individual's actual or perceived race, color, … that has the purpose or effect of substantially interfering with the individual's work performance or creating an intimidating, hostile, or offensive working environment."

260.    By its conduct as alleged herein, Defendants unlawfully discriminated against Plaintiff and those similarly situated in violation of the IHRA, under both disparate treatment and disparate impact theories of liability.

261.    By its conduct as alleged herein, Defendants unlawfully harassed Plaintiff and those similarly situated in violation of the IHRA.

262.    Plaintiff and Black individuals who applied to, work at, or worked for Ameren in its Apprentice and Skilled Craft workforce were harmed and will continue to suffer irreparable injury by Defendants' conduct.

263.    Plaintiffs and the class have suffered substantial economic loss of compensation and benefits as a result of the intentional discrimination by Defendants.

264.    Defendants' conduct has caused pain and suffering and loss of future earning

capacity to Plaintiff and to the class.

265.    As a direct and proximate result of Defendants' discrimination against them, Plaintiff and the class are entitled to the relief set forth in the Prayer below.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of himself and the class he seeks to represent, Plaintiff respectfully request that this Court find against Defendant as follows:

a.  Certify this case as a class action and certify a class of Black individuals who applied to, work at, or worked for Ameren in their Apprentice and Skilled Craft workforce;

b.  Designate Plaintiff as Class Representative and designate Plaintiff's counsel of record as Class Counsel;

c.  Declare that Defendants' acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981, 42 U.S.C. § 2000e *et seq.,* and 775 ILCS 5/2-102(A) and (C);

d.  Declare that Defendants engage in a pattern or practice of racial discrimination against Black individuals and employ policies and practices that have an unlawful disparate impact on Black individuals;

e.  Order Defendants to reform their discriminatory policies and practices;

f.  Order Plaintiff and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise make Plaintiff whole;

g.  Award Plaintiff and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Defendant's unlawful conduct;

h.  Award Plaintiff and all others similarly situated compensatory and punitive damages;

i.  Award Plaintiff and all others similarly situated prejudgment interest and attorneys'

fees, and costs, as provided by law;

j.  Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs; and

k.  Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

By: */s/ Diana E. Wise*
**Diana E. Wise – IL Bar #6304459**
WISE LAW LLC
637 W Highway 50, #601
O'Fallon, IL 62269
Ph: 217-556-8036
Email: dwise@wiseconsumerlaw.com

*Attorney for Plaintiff and those similarly situated*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2025, I filed the foregoing document via this Court's CM/ECF system, which should further distribute a true and accurate copy of the foregoing to all counsel of record.

*/s/ Diana E. Wise_____*
**Diana E. Wise – IL Bar #6304459**
WISE LAW LLC
W Highway 50, #601
O'Fallon, IL 62269
Ph: 217-556-8036
Email: dwise@wiseconsumerlaw.com

***Attorney for Plaintiff and those similarly situated***